Brian VANDIVER; Ronald Vandiver
and Kathy Vandiver,
Plaintiffs–Appellants,

v.

HARDIN COUNTY BOARD OF EDU-
CATION; Stephen W. Towler, as Super-
intendent of Schools for Hardin County
Public Schools, and Individually; Wil-
liam E. Kelley, as Principal of West
Hardin High School, and Individually;
Kenneth Hayden, James A. Mayer, Ha-
rold Miller, James R. Aldridge, and J.R.
Cardin, as Members of the Hardin
County School Board, and Individually;
and Commonwealth of Kentucky, De-
fendants–Appellees.

No. 89–5776.

United States Court of Appeals,
Sixth Circuit.

Argued May 1, 1990.

Decided Feb. 12, 1991.

Theodore H. Amshoff, Jr. (argued), Guy Anthony Bayes, Amshoff, Amshoff & Searcy, James M. Henderson, Sr., Christian Advocates Serving Evangelism, Washington, D.C., for plaintiffs-appellants.

Robert L. Chenoweth (argued), Bryan, Fogle & Chenoweth, Frankfort, Ky., Donald E. Skeeters, Kimberly, Winkenhofer, Shumate, Skeeters & Bennett, Radcliff, Ky., for defendants-appellees.

Frederic J. Cowan, Atty. Gen., David Vandeventer, Asst. Atty. Gen., Frankfort, Ky., for Com. of Ky.

Before KENNEDY, Circuit Judge, and ENGEL and WELLFORD,* Senior Circuit Judges.

ENGEL, Senior Circuit Judge.

At issue here is the extent to which a student can compel a public school to award him academic credit for course work completed in a religious home study program, when state law allows the public school to require students to pass examinations before receiving credit for courses studied at home. Brian Vandiver and his parents, Ronald and Kathy Vandiver, allege that the Hardin County Board of Education and various public school officials improperly required Brian to pass equivalency exams in order to gain credit for his religious home study program, thereby allegedly violating the Vandivers' constitutional rights under the free exercise, due process and equal protection clauses of the U.S. Constitution. The Vandivers brought suit under 42 U.S.C. sections 1983 and 1985 for declaratory, injunctive and monetary relief. Their complaint also included pendent state law claims under the religious liberty clause of the Kentucky Constitution, section 5. Following hearings on the preliminary injunction and on the merits, the district court ruled against the plaintiffs on each of their federal claims and granted the defendants' motion to dismiss the action.

We agree with the judgment of the district court on each of the issues presented and affirm the dismissal of the federal claims with prejudice. We remand the case only for issuance of an order indicating that the plaintiffs' state law claims were dismissed without prejudice.

* The Honorable Harry W. Wellford assumed senior status effective January 21, 1991.

## I. FACTS

Ronald and Kathy Vandiver describe themselves as devout "spirit-filled, born-again" Christians. Their son Brian, born July 1, 1970, encountered disciplinary and academic problems in the eighth grade, and was forced to repeat that year of classes. Brian's behavioral and academic troubles continued during his freshman (ninth grade) year at West Hardin (Kentucky) High School, and his parents decided that Kathy Vandiver would teach Brian his tenth grade courses at home during the 1986–87 school year using a Christian course of instruction called Alpha Omega. In addition to Bible study, the program provided a Christian perspective to courses in the core curriculum of the state Board of Education.

During the year of home study, Brian's attitude and achievement levels improved significantly, and he and his parents agreed that he could return to the public high school for the coming 1987–88 school year. Brian successfully completed the 1987–88 school year at the public high school, pursuing primarily an eleventh grade course of study. However at the beginning of the 1988–89 school year, he was not classified by school officials as a senior (twelfth grade student). School administrators contended that Brian had failed to comply with the following state administrative regulation:

The local school district shall be responsible for the appropriate assignment of a student transferring from a nonaccredited secondary school to the class or grade best suited for the student. Previous credit earned by a student in a nonaccredited secondary school shall be awarded by the local school district by one (1) of the two (2) following methods:

(a) Pass an examination of similar nature and content to the examination used for other students receiving credit for a particular course within the school district and graded on a comparable basis; or

(b) Successful performance of the student in a higher level of the course when the courses are sequential in nature such as English, mathematics, history, and science. Successful performance shall be defined as achieving an average grade in the course by the twelfth week of school. 704 Ky.Admin.Reg. 3:307, § 2. Options (a) and (b) will be referred to as "equivalency testing" and "probationary placement" respectively.

In the fall of 1987, after Brian's year of home instruction, Kathy Vandiver had agreed with defendant Kelley, the principal of West Hardin High School, that Brian would take equivalency tests in certain areas to qualify for credit. Since the equivalency tests were to be based on the specific content of the public high school courses rather than the Alpha Omega course that Brian had actually studied, Brian would have been required to study unfamiliar textbooks to prepare for the exams. To lessen Brian's load, Kathy Vandiver agreed with Kelley that Brian would be tested in only two subjects, then would take correspondence courses offered by another county for credit in the remaining courses.

Several weeks later, upon seeing how much studying would be necessary to handle this combined load, Kathy and Ronald Vandiver decided that the burden of testing and extra courses would prove too onerous for Brian. For his part, Brian decided on the basis of his religious belief that the load was unfair and more than what God would want him to bear. The Vandivers then asked the West Hardin High principal if he would drop the equivalency testing requirement since Brian had by that point been back in the public school for twelve weeks and had met the requirements for the probationary placement option under the regulations. In November 1987, the principal took the request to the county school board, which decided to maintain the equivalency testing requirement. The school board's decision was reached at a meeting open to the public, but the Vandivers were not specifically informed that they could or should attend. Brian declined to take the required equivalency tests, and school officials refused to classify him as a senior for the 1988–89 school year.

In December 1988, the Vandivers asked to appear before the Board of Education to discuss their concerns about Brian's academic standing in the public school. Although the Board initially told the Vandivers they would have two hours to speak, the Board later reduced the allotted time to thirty minutes. After the Vandivers learned that none of Brian's teachers would speak on his behalf, allegedly because of pressure from their superiors, the Vandivers decided not to attend the school board meeting. On April 5, 1989, the Vandivers commenced this lawsuit, seeking to compel the school board to award Brian academic credit for his year of tenth grade study at home.

## II. STATUTE OF LIMITATIONS

The district court held that under *Owens v. Okure,* 488 U.S. 235, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989), the plaintiffs' section 1983 action was not timely filed under Kentucky law, correctly anticipating this circuit's decision in *Collard v. Kentucky Bd. of Nursing,* 896 F.2d 179, 181–83 (6th Cir. 1990). The Supreme Court in *Owens* stated:

> We accordingly hold that where state law provides multiple statutes of limitations for personal injury actions, courts considering § 1983 claims should borrow the general or residual statute for personal injury actions.

488 U.S. at 249–50, 109 S.Ct. at 582 (footnote omitted).

Relying on *Owens,* the court in *Collard* concluded that "section 1983 actions in Kentucky are limited by the one year statute of limitations found in [Ky.Rev.Stat.] section 413.140(1)(a)." Since the Vandivers' suit was filed on April 5, 1989, the district court properly concluded that their due process attack on the defendants' decision in the fall of 1987 not to grant Brian eleventh grade status through the probationary placement option was time-barred.

■ At oral argument, the Vandivers argued that even under a one year statute of limitations, their complaint was still timely as it alleged a continuing denial of Brian's proper placement in public school. The school officials' mere adherence to a discrete decision regarding Brian's academic standing in the fall of 1987, however, does not suffice to state a claim for a continuing violation when he was denied twelfth grade status in the fall of 1988. *Compare Smith v. Kaldor,* 869 F.2d 999, 1007–08 (6th Cir. 1989) (no continuing violation existed linking plaintiff's second termination from employment with his earlier discharge and reinstatement); *with Held v. Gulf Oil Co.,* 684 F.2d 427, 430 (6th Cir.1982) (where discriminatory acts continued to occur throughout plaintiff's employment she could bring an action alleging a continuing pattern of discrimination even though an action for the initial discriminatory acts would have been time-barred). Since there was no continuing violation here, the Vandivers, by commencing legal action in April 1989, could attack only the defendants' denial of twelfth grade status to Brian in the 1988–89 school year.

## III. THE PARENTS' STANDING TO SUE

■ Barred by the statute of limitations from pursuing any claim with respect to Brian's academic status in the fall of 1987, Ronald and Kathy Vandiver are likewise barred as to similar claims arising after July 1, 1988 by the unchallenged fact that on that date Brian turned eighteen and attained legal majority under state law. Ky.Rev.Stat. § 2.015. After that date, his parents no longer had standing to sue in a representative capacity to enforce his rights. Also any constitutional rights they themselves enjoyed attendant to the upbringing and education of Brian no longer applied thereafter. Since Kathy and Ronald do not contend that any of their claims arose in the narrow window between April 5 and July 1, 1988, the district court properly dismissed their claims from the suit.

## IV. EQUAL PROTECTION

■ Brian claims that enforcement of the equivalency testing requirement violated his rights under the equal protection clause of the fourteenth amendment. Spe-

cifically, he argues that the defendants have uniformly allowed students transferring into the Hardin County school system from an unaccredited private school to gain transfer credit by the probationary placement method, while requiring Brian, the only transferee from a home study program, to comply with the testing alternative. The district court found that Brian and the private school transferees were not similarly situated, and rejected any equal protection claim based upon such comparisons.

Assuming for the moment that Brian has a distinct and timely equal protection claim concerning the defendants' refusal to classify him as a twelfth grade student in the 1988–89 school year, we agree with the district court. *See Murphy v. Arkansas,* 852 F.2d 1039, 1043–44 (8th Cir.1988) (persons who preferred to school their children at home were not members of a suspect class for equal protection purposes, and state's tighter regulations for home schools than private schools were rationally related to state's interest in insuring that its citizens were being properly educated). Kentucky's statutory framework for awarding academic credit for school work performed in the home similarly bears a rational relationship to the state's legitimate interest in setting uniform public school advancement and graduation requirements.

A further reason to reject the equal protection claim appears in the record. Clyde Story, the principal of the North Hardin High School for the relevant time period, testified that the transferees from the private academy were granted credit for prior course work without being required to meet either the probationary placement or the equivalency testing requirement on Story's mistaken understanding that the academy was accredited. *See* Transcript vol. 3 at 65–69. Though the decision to grant credit for prior course work to other transferees thus appears to have been based upon a mistake of fact, we see nothing in the equal protection clause which requires us to compound the principal's error by forcing the school district to grant a similar exception in Brian's case now that the error has been discovered. The error does not detract from the validity of the state's or the school district's equivalency testing requirement, and the equal protection clause was not designed to remedy inadvertent distinctions, even among similarly situated persons.

## V. FREE EXERCISE OF RELIGION

Brian testified at trial that his decision to return to West Hardin High School was based on his religious beliefs. He also testified that those beliefs underlay his objections to the equivalency testing requirement. Brian explained that he believed the exams unfairly discounted his successful completion of the tenth grade home study course, and the proposed correspondence courses placed undue burdens on him as he carried a normal load of new courses at the high school in the fall of 1987. Since he believes "the Lord will [not] allow me a bigger burden than I could carry," (Transcript vol. 2 at 17), he objects to the testing requirement. It should be noted that unlike his parents, Brian does not claim that his decision to commence the home study program was based on his religious beliefs. Brian testified that he had no religious beliefs at that time. Transcript vol. 2 at 12.

We accept as true Brian's assertions that his religious convictions are sincerely held, and that his objections to the equivalency testing requirement are based on his religious beliefs. "[C]ourts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim." *Employment Division, Dep't of Human Resources of Oregon v. Smith,* —— U.S. ——, 110 S.Ct. 1595, 1604, 108 L.Ed.2d 876 (1990). *See also Thomas v. Review Board, Indiana Employment Security Div.,* 450 U.S. 707, 716, 101 S.Ct. 1425, 1431, 67 L.Ed.2d 624 (1981) ("Courts are not arbiters of scriptural interpretation").

■ The religion clauses of the first amendment, made applicable to the states by the fourteenth amendment, *see Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940), provide

that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. Am. I. The latter clause clearly excludes all "governmental regulation of religious *beliefs* as such." *Sherbert v. Verner*, 374 U.S. 398, 402, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963). However the first amendment does not prevent the government from regulating behavior associated with religious beliefs. *See United States v. Lee*, 455 U.S. 252, 261, 102 S.Ct. 1051, 1057, 71 L.Ed.2d 127 (1982) ("[E]very person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious beliefs").

■ In a recent ruling of great significance in the free exercise of religion context, the Supreme Court has held that the "right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Employment Division, Dep't of Human Resources of Oregon v. Smith*, ⎯ U.S. ⎯, 110 S.Ct. 1595, 1600, 108 L.Ed.2d 876 (1990) (quoting *United States v. Lee*, 455 U.S. 252, 263 n. 3, 102 S.Ct. 1051, 1058 n. 3, 71 L.Ed.2d 127 (1982) (Stevens, J., concurring in judgment)). Under pre-*Smith* free exercise jurisprudence, governmental actions that substantially burdened a religious practice had to be justified by a compelling government interest to survive a free exercise challenge. *See Sherbert v. Verner*, 374 U.S. 398, 402–03, 83 S.Ct. 1790, 1792–93, 10 L.Ed.2d 965 (1963). The recent *Smith* decision, however, "conclude[d] that the sounder approach ... is to hold the [compelling interest] test inapplicable to such challenges." 110 S.Ct. at 1603. In *Smith*, the Court held that a criminal statute of general applicability not directed at religious practices was simply not subject to a free exercise challenge.

*Smith* sharply criticized the use of *Sherbert* balancing, finding that a compelling government interest test, while useful in evaluating government distinctions based on race or government regulations on the content of speech, is inappropriate in free exercise cases. "What it produces in those other fields—equality of treatment, and an unrestricted flow of contending speech—are constitutional norms; what it would produce here—a private right to ignore generally applicable laws—is a constitutional anomaly." *Smith*, 110 S.Ct. at 1604 (footnote omitted). The Court concluded that "generally applicable, religion-neutral laws that have the effect of burdening a particular religious practice need not be justified by a compelling government interest" 110 S.Ct. at 1604 n. 3, and stated "it is horrible to contemplate that federal judges will regularly balance against the importance of general laws the significance of religious practice." 110 S.Ct. at 1606 n. 5.

While *Smith* addresses the conflict between a criminal statute and behavior allegedly protected by the free exercise clause, other circuits have extended its holding to neutral civil statutes as well. *See Salvation Army v. Department of Community Affairs*, 919 F.2d 183 (3rd Cir. 1990) (family center for disadvantaged persons was not exempt from state statute regulating boarding houses); *Rector, Wardens, and Members of the Vestry of St. Bartholomew's Church v. City of New York*, 914 F.2d 348 (2nd Cir.1990) (church was not exempt from city's Landmarks Preservation Law); *Intercommunity Center for Justice and Peace v. INS*, 910 F.2d 42 (2nd Cir.1990) (religious organization was not exempt from compliance with Immigration Reform and Control Act). We agree with the Third Circuit in *Salvation Army*, 919 F.2d at 195, that the Supreme Court would not "have been as concerned as it was to distinguish and explain numerous previous free exercise cases that address 'civil' statutes" were the *Smith* holding limited to the criminal context alone.

We conclude that Kentucky's regulation of public school testing and academic standing is a valid and neutral law of general applicability within the meaning of *Smith*, so that a free exercise challenge is presumably precluded. Yet *Smith* does recognize a special place in first amendment jurisprudence for those "hybrid" statutes which affect not only religiously moti-

vated actions but also burden other constitutionally protected rights. 110 S.Ct. at 1601–02. Among the latter rights specifically cited by the Court in *Smith* is the right of parents to direct the education and upbringing of their children, as recognized in *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (invalidating compulsory school attendance laws as applied to Amish parents who refused on religious grounds to send their children to school) and *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (invalidating mandatory public school attendance laws). The *Smith* decision implies without stating that those hybrid claims which raise a free exercise challenge coupled with other constitutional concerns remain subject to strict scrutiny. 110 S.Ct. at 1601–02.

Here, all claims brought by Brian's parents are barred by the statute of limitations and their lack of standing to sue as Brian's representatives after he reached the age of eighteen. As a result, only if Brian's own free exercise challenge is joined with other constitutional concerns may his claim survive the free exercise standard of *Smith.*

Both *Yoder* and *Pierce* concerned the traditional interest of *parents* with respect to the religious upbringing of their children. Where a *child* also shares that strong interest in religious education, *Yoder*'s special concern for parental interests should clearly extend to the child as well. In both *Yoder* and *Pierce*, the challenged statute or regulation itself required parents to send their children to public school, a practice in direct conflict with the religious beliefs of the parents. *Smith* refers to the constitutional interest at stake in those cases as "the right of parents ... to direct the education of their children." 110 S.Ct. at 1601. The compulsory attendance statutes in both *Yoder* and *Pierce* were struck down because they burdened both this educational interest and the parents' free exercise rights.

In this case, however, no suggestion is made that Kentucky's statute or any action of the defendants interfered with Brian's right to pursue a religious education in the home. Brian's alleged interest is in minimizing the burdens of test-taking, not in religious education. He has challenged a generally applicable, religion-neutral testing requirement, stating that the test was "a bigger burden than I could carry". Transcript, vol. 2 at 17. He does not have a religious objection to testing in general, for he responded "Yes, sir." when asked at trial if his religious difficulty was with the equivalency tests only, and not with other tests. *Id.*

Even were Brian to hold religious objections to all tests, which he does not, no special constitutional protections have been recognized for those who feel burdened by testing. In the absence of such a constitutional interest, *Smith* precludes a free exercise challenge to a statute of general applicability not directed at religious practices. While *Yoder* presented a "sharp conflict" between a "fundamental mode of life mandated by ... religion" and "the values and programs of the modern secondary school," 406 U.S. at 217, 92 S.Ct. at 1534, objections to test-taking, even objections based on religious grounds, do not present a similar conflict. *Smith* declined to entertain a free exercise challenge by parties claiming a religious objection to a religion-neutral law. In the absence of a special constitutionally recognized interest to abstain from test-taking, the court may not entertain a free exercise challenge to the statute in question. Once Brian's home education ended, the state statute's religion-neutral terms allowed the defendants to require Brian to pass equivalency tests, and his free exercise challenge must fail.

Even so, we note that *Smith* does appear to leave open a small crack for free exercise challenges to generally applicable, religion-neutral laws even when such challenges are not joined with an alleged infringement of another constitutional interest. "[W]here the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Smith*, 110 S.Ct. at 1603 (quoting *Bowen v. Roy*, 476 U.S. 693, 708, 106 S.Ct. 2147, 2156, 90 L.Ed.2d 735 (1986)). This

standard has been used to strike down state unemployment compensation rules that conditioned the availability of benefits on an applicant's willingness to work under conditions forbidden by his religion. *See Smith*, 110 S.Ct. at 1602.

The Kentucky statute governing the grade assignment of students transferring from nonaccredited schools allows local school districts to award credit for prior course work by one of two methods, which we have referred to as equivalency testing and probationary placement. Our reading of *Smith* and *Bowen* indicates that the Court's concern for the religion-neutral application of "individual exemptions" does not extend to a local school board's decision to select one of the two available methods for awarding academic credits to transferees into the public schools, as long as that decision is unaccompanied by any evidence of discriminatory intent against religion. The unemployment compensation cases held that where a state refused to extend to a religious concern the same exemption extended to other "good causes" for a benefit claimant's unwillingness to work, the state was required to demonstrate a compelling reason for denying the requested religious exemption. *See Sherbert v. Verner, supra; Thomas v. Review Board, Indiana Employment Div.*, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987). Yet here, the only suggestion that an exemption was made under the Kentucky statute concerns the admission of students from an unaccredited private school. As noted in our discussion of the equal protection claim, this "exemption" apparently resulted from the school principal's mistaken belief that the school was in fact accredited. There is no other evidence that the defendant school officials declined to extend to transferees from religious schools or religious home study programs any "exemptions" which other transferees received.

As for the school officials' decision to require Brian to satisfy the testing requirement rather than the probationary placement option, we again see no evidence that

Brian's religious beliefs played a role, or that other transferees received an "exemption" denied to Brian. "The Free Exercise Clause affords an individual protection from certain forms of governmental compulsion; it does not afford an individual a right to dictate the conduct of the Government's internal procedures." *Bowen v. Roy*, 476 U.S. at 700, 106 S.Ct. at 2152. The Kentucky statute leaves the selection of the equivalency testing or probationary placement method in the hands of local school officials, and all evidence indicates that the Hardin County School Board's choice of one alternative over the other is based strictly on educational factors and does not entail consideration of the student's other non-educational preferences for one method or the other.

While Brian was the only transferee to enter the Hardin public schools from a home school environment, so that the school board's decision to require him to satisfy the testing requirement can hardly be termed a policy for similarly situated transferees, the defendant school officials would clearly have a rational, non-discriminatory reason for requiring all home school transferees to satisfy the equivalency testing requirement rather than the probationary placement option, given the state's understandable concerns for the quality of home education. Absent evidence that similarly situated transferees from nonreligious home schools were provided an "exemption" which Brian was not, we find *Smith* dispositive of Brian's free exercise claim.

## VI. DUE PROCESS

As discussed above, the plaintiffs' procedural due process challenge to the school board's failure to give notice of the November 1987 public meeting at which the board decided to hold Brian to the testing requirement is barred by the applicable statute of limitations. In addition, all other due process objections of Ronald and Kathy are barred by their lack of standing as well as the statute of limitations.

■ Brian challenges the school board's decision to limit the allotted speaking time of his parents to thirty minutes at the board's December 1988 meeting. Although Kathy Vandiver requested and received the time to address the board about the equivalency testing requirement and Brian's grade placement, she ultimately decided not to take advantage of this opportunity for fear she would be ridiculed by the board. We decline to find that the board's decision limiting the speaking time denied Brian procedural due process, particularly where his mother failed to take advantage of the time that was allotted to her to address the board members.

Also under the rubric of due process, Brian argues that the school officials by their own admission apparently never even considered applying the less demanding probationary placement option in his case. As already discussed, however, the Kentucky statute leaves the choice of testing or probationary placement in the hands of local school districts. Absent evidence of discriminatory selection on the part of the school officials, no due process violation may be found. Brian was the only Hardin County student to seek credit for home study according to the trial record, and we find no evidence that the defendants' decision was made in a procedurally improper manner in his case.

## VII. PENDENT STATE CONSTITUTIONAL CLAIMS

The Vandivers' complaint included claims for violations of section 5 of the Kentucky Constitution, which bars the restriction of a state citizen's rights on account of his religious beliefs. There is no indication in the record that these claims were ever withdrawn or otherwise separately resolved. Although the district court addressed only the plaintiffs' federal statutory and constitutional claims, the court ordered that the entire action be dismissed with prejudice. On appeal Brian reasserts without discussion his state constitutional claims.

■ Although pendent jurisdiction exists over intertwined state and federal claims arising out of the same factual matrix, the exercise of pendent jurisdiction is a matter of discretion for the district court. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Roberts v. City of Troy*, 773 F.2d 720, 726 (6th Cir. 1985). A federal court should "avoid needless decisions of state law ... both as a matter of comity and to promote justice between the parties for procuring for them a more sure-footed reading of applicable law." *Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139. The proper recourse where pendent jurisdiction is not exercised is dismissal of the state claims without prejudice. *Roberts*, 773 F.2d at 726–27.

■ In this case, the district court's dismissal of the federal claims without specifically addressing the pendent state law claims requires that those state claims be dismissed without prejudice. The action should properly be remanded for the district court to amend the order of dismissal to clarify that the state constitutional claims are dismissed without prejudice.

## VIII. CONCLUSION

The parties on appeal also raise various arguments regarding qualified immunity for the defendant officials and sovereign immunity for the Commonwealth of Kentucky. In light of our disposition on the merits, it is unnecessary to address these points.

We therefore AFFIRM the district court's dismissal of the federal claims. We REMAND the case for issuance of an order clarifying that the state law claims are dismissed without prejudice.