Chad TRIPLETT; Tracey Triplett; Phillip Triplett; and Gwen Triplett, Appellants,

v.

LIVINGSTON COUNTY BOARD OF EDUCATION; Lee Jones; Mike Joiner; Tony Lasher; Darrell Stafford; Phillip Threlkeld; Tim Porter; and Tom Counts, Appellees.

LIVINGSTON COUNTY BOARD OF EDUCATION; Lee Jones; Mike Joiner; Tony Lasher; Darrell Stafford; Phillip Threlkeld; Tim Porter; and Tom Counts, Appellants,

v.

Chad TRIPLETT; Tracey Triplett; Phillip Triplett; and Gwen Triplett, Appellees.

Nos. 96–CA–1046–MR, 96–CA–1371–MR.

Court of Appeals of Kentucky.

Aug. 15, 1997.

Rehearing Denied Oct. 10, 1997.

Discretionary Review Denied June 10, 1998.

James F. Dinwiddie, Leitchfield, for Appellants (in 96–CA–1046)/Appellees (in 96–CA–1371).

David L. Yewell, Owensboro, for Appellees (in 96–CA–1046)/Appellants (in 96–CA–1371).

Before COMBS, DYCHE and SCHRODER, JJ.

*OPINION*

SCHRODER, Judge.

This is an appeal from a judgment declaring that the Kentucky Instructional Results Information System ("KIRIS") assessment exam and the requirement to take said exam are not in violation of parents' or students' constitutional rights, nor in violation of certain federal laws. This is also an appeal by the school from a ruling mandating that the KIRIS assessment exam shall be open for public review. We affirm the court's decision regarding the constitutionality of the exam and the requirement to take the exam, reverse the open records order, and remand for proceedings consistent with this opinion.

In response to the Kentucky Supreme Court's ruling in *Rose v. Council for Better Education, Inc.*, Ky., 790 S.W.2d 186 (1989), the Kentucky General Assembly enacted the Kentucky Education Reform Act ("KERA"), effective July 13, 1990, which mandated that the Kentucky Board of Education ("KBE") develop a system of public education whereby state government, local committees, parents, students and school employees would share the responsibility of improving public education in Kentucky. Part of KERA mandates that the KBE create and implement "a statewide, primarily performance-based assessment program to ensure school accounta-

bility for student achievement of the goals set forth in KRS 158.645." KRS 158.6453. The goals in KRS 158.645, which codified those set forth in *Rose, supra* at 212 are:

(1) Communication skills necessary to function in a complex and changing civilization;

(2) Knowledge to make economic, social, and political choices;

(3) Understanding of governmental processes as they affect the community, the state, and the nation;

(4) Sufficient self-knowledge and knowledge of his mental and physical wellness;

(5) Sufficient grounding in the arts to enable each student to appreciate his or her cultural and historical heritage;

(6) Sufficient preparation to choose and pursue his life's work intelligently; and

(7) Skills to enable him to compete favorably with other students in other states.

KRS 158.6453 required that an interim assessment test be given to students in grades 4, 8 and 12 by the 1991–1992 school year and that the permanent assessment program be implemented no later than the 1995–1996 school year.

In establishing the assessment program, KERA provided for the KBE to contract with authorities in the field of performance-based assessment. The KBE contracted with such authority in New Hampshire and ultimately created the Kentucky Instructional Results Information System ("KIRIS") assessment exam which assesses student skills in reading, mathematics, writing, science and social studies.

The primary purpose of the KIRIS test is not for evaluating individual student performance, but for evaluating the progress of the school systems under KERA. Performance levels of Novice (being the lowest), Apprentice, Proficient and Distinguished were established in evaluating the KIRIS exam results. Each of these performance levels was given a rating from 0 points for the Novice, to 140 points for the Distinguished. Through a fairly complicated formula, the grades of the

individuals tested are computed into an over-all school rating. The testing provides both cognitive (academic) and non-cognitive (drop-out rates, attendance, retention rates, etc.) data which come together first to form a baseline score. Once the scores are established, thresholds, or goals, are established for each school to meet. If the school exceeds the threshold by one point and moves ten percent or more of its students out of the "Novice" level, it is considered successful and qualifies for rewards. Schools that improved, but did not meet their goals must develop improvement plans and work to raise their levels of achievement. For those schools in crisis whose scores drop below their baseline, assistance is made available.

Simply put, those school districts where students do well on the KIRIS test are rewarded, and those school districts where students do poorly are penalized. The law provides for sanctions to be imposed upon those in crisis (staff placed on probation), and financial rewards are given to those districts that are successful. KRS 158.6455. Therefore, each school district in this state has a financial interest in the outcome of the test scores of KIRIS examinations given within its district.

Early in 1994, prior to the KIRIS assessment tests' being administered in the spring, the parents of Chad Triplett, a senior, and Tracey Triplett, an eighth-grader (hereinafter "the Tripletts") informed the Livingston County School System (hereinafter "the school") that they did not want their children to take the KIRIS assessment test. When the 1993–1994 school year commenced, the Livingston County schools had no policy requiring students to take the KIRIS tests. Thus, at first, the Tripletts were told by the school that their children would not be required to take the KIRIS test. Subsequently, however, the KBE informed the Livingston County school system that it would hold all schools accountable for the performance of all students and, in the absence of KIRIS assessment information about the performance of a child, the school would be assigned a novice level performance for that child. Consequently, on February 14, 1994,

the Livingston County Board of Education passed the following policy:

> Students shall complete all parts of KIRIS assessment before advancing to the next grade or graduating, including math and writing portfolios.

Prior to the tests' being given, Mrs. Triplett requested to review the tests, and on February 16 and February 18, 1994, she was allowed to examine them. There is some question as to how much of the actual tests she was allowed to examine and how long she was given to review the tests. She was not allowed to take any notes or make copies.

Based primarily on religious objections to the tests, the Tripletts refused to let Chad and Tracey take the KIRIS assessment test in 1994. As a result of their not taking the test, the Livingston County School Board refused to allow Chad to graduate and Tracey to be promoted to the ninth grade, although Chad and Tracey had completed all other necessary requirements for graduation and promotion, respectively.

On May 25, 1994, the Tripletts filed the action herein against the Livingston County Board of Education, seeking a permanent injunction to prevent the school board from excluding Chad from graduation and a declaratory judgment establishing that Chad and Tracey had fulfilled all requirements for graduation and promotion, respectively. The petition for declaratory judgment also requested that the court rule regarding the Tripletts' claims of violation of privacy, infringement of their exercise of religion, interference with their parental rights, denial of their due process rights and their rights under certain federal laws.

Both parties filed various affidavits in support of their positions, including some from educational experts giving their opinions regarding the merits or lack thereof of the KIRIS assessment test. Additionally, the Tripletts filed a request for production of the KIRIS assessment test for review in preparation for trial. The court ordered that the test be delivered by the school to a Special Commissioner who would monitor the review by the Tripletts and their counsel.

Subsequently, the school made a motion for summary judgment. On February 22, 1996, the circuit court granted the school's motion and dismissed the Tripletts' petition. The court noted that since the petition was for declaratory judgment seeking a permanent injunction, it was an equitable action in which the court must decide both issues of law and fact.

In the court's 21–page opinion and order, the court reviewed the KIRIS exam questions in the record in light of the specific objections raised by the Tripletts, and found that the Tripletts' claims had no merit:

> The Court finds nothing in the examination questions which either interferes with the parental rights or the control in the upbringing of the children, infringes upon the free exercise of religion nor the establishment thereof, nor violates any of the rights under the Family Educational Rights and Privacy Act, nor their right to privacy. While the KIRIS assessment procedure as well as KERA itself may be subject to political debate, the implementation of that law has already been held to be legitimate and is not an exercise of arbitrary power in violation of Section Two of the Kentucky Constitution. (See *Chapman v. Gorman*, 839 S.W.2d 232 (1992)).

The court went on to conclude that it was not unconstitutional to require all students to take the KIRIS exam. The court did, however, agree with the Tripletts' argument as to their right to review the KIRIS exam questions. The court ruled that the KIRIS exam should be made open for review by the public. In a subsequent order the court expanded its earlier ruling to allow the KIRIS exam to be viewed by the public at the Livingston County Circuit Clerk's office. From the February 22, 1996 judgment, the Tripletts now appeal the ruling regarding the constitutionality of the KIRIS exam and the requirement to take the KIRIS exam, while the school appeals from the rulings allowing the KIRIS exam to be made open for public viewing.

We first address the Tripletts' argument that summary judgment was premature in this case because material questions of fact existed. They specifically point to the affidavits of the various experts in the record containing opposing views on the KIRIS assessment exam. The Tripletts also maintain that they will present other evidence discrediting the KIRIS exam if the action is allowed to proceed.

Summary judgment should be used to terminate litigation when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at trial warranting judgment in his favor and against the movant. *Steelvest, Inc. v. Scansteel Service Center, Inc.*, Ky., 807 S.W.2d 476 (1991). The function of a motion for summary judgment is to secure final judgment as a matter of law when there is no genuine issue of material fact. *Conley v. Hall*, Ky., 395 S.W.2d 575 (1965). We would agree with the lower court that the issues in the present case are matters of law, not fact. While the determination of the constitutionality of the KIRIS exam may involve factual matters, the ultimate decision is one of law. In a similar case challenging a Louisiana act requiring the teaching of creationism, the United States Supreme Court found that summary judgment was proper, even in the face of uncontroverted affidavits submitted by the respondent. *Edwards v. Aguillard*, 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987). We believe the present case was proper for summary judgment since the record contained everything necessary for the court to decide the issues of law, which we shall now address.

■ The Tripletts argue that when the Livingston County Board of Education passed the policy requiring that all students take the KIRIS exam mid-year in the school year (February), it failed to provide them with adequate notice of the requirement and, thus, operated as an ex post facto law. We believe this argument is without merit. The passage of the KIRIS exam requirement did not punish any action that had already been taken by the Tripletts and did not serve to prejudice the Tripletts in any way. The KIRIS exam requires no advance preparation beyond the student's normal academic program; hence, further notice would have served no purpose.

The Tripletts also argue that the local school board did not have legal authority to require that all students take the KIRIS exam. Although there is nothing in KRS 158.6453 (the statute mandating that the Kentucky Board of Education create and implement an assessment program) specifically requiring that all students must take the assessment exam, we believe statutory authority exists for the local board of education to establish such a policy. KRS 156.160(1)(c) allows the KBE to promulgate regulations regarding the minimum requirements for high school graduation and requires that the KBE review the graduation requirements in light of the expected outcomes for students and schools set forth in KRS 158.6451. 704 KAR 3:305 § 3(1) & (2) provides:

(1) Each student who satisfactorily completes the requirements of this administrative regulation and such credits and additional requirements as may be imposed by a local board of education shall be awarded a graduation diploma.

(2) Local boards of education may grant different diplomas to those students who complete credits above the minimum number of credits as established by the State Board for Elementary and Secondary Education.

The above regulation permits local boards to establish additional graduation requirements above the minimum requirements set forth by the KBE. Indeed, the concept of decentralization of schools is a large part of KERA. The individual schools are responsible for their own performance on the KIRIS assessment exams and there is much at stake for the individual schools in terms of rewards and penalties. *See* KRS 158.6455. Therefore, each school district should have the authority to set policy which relates to the assessment process so long as it does not conflict with KERA or the responsibilities delegated solely to the KBE by KERA.

We next move on to the Tripletts' primary claim that requiring the Triplett children to take the KIRIS assessment exam violates: their constitutional right to free exercise of religion; their constitutional right as parents to direct the education and upbringing of their children, *see Wisconsin v. Yoder*, 406

U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); and the Hatch Amendment to the Family Educational Rights and Privacy Act, 20 U.S.C.A. § 1232 (Hatch Amendment). The thrust of the Tripletts' claim is that the content of the KIRIS exam questions offends their religious beliefs because the test: establishes a religious or moral code; invades the students' religious and moral beliefs; discriminates on the basis of religion; and compels the students to speak against their beliefs by selecting morally objectionable responses.

We shall first address the Tripletts' allegation that the KIRIS exam violates 20 U.S.C.A. § 1232h(b) of the Hatch Amendment which provides as follows:

No student shall be required, as part of any applicable program, to submit to a survey, analysis, or evaluation that reveals information concerning -

(1) political affiliations;

(2) mental and psychological problems potentially embarrassing to the student or his family;

(3) sex behavior and attitudes;

(4) illegal, anti-social, self-incriminating and demeaning behavior;

(5) critical appraisals of other individuals with whom respondents have close family relationships;

(6) legally recognized privileged or analogous relationships, such as those of lawyers, physicians, and ministers; or

(7) income (other than that required by law to determine eligibility for participation in a program or for receiving financial assistance under such program),

without the prior consent of the student (if the student is an adult or emancipated minor), or in the case of an unemancipated minor, without the prior written consent of the parent.

We find there is nothing in the exam which compels a student to reveal any type of information listed in 20 USCA § 1232h(b). A portion of the exam does include a multiple-choice student questionnaire in which the student is asked to give certain factual infor-

mation about himself or herself, such as how much time he or she spends on homework each day and whether he or she attended kindergarten, but the questionnaire is prefaced by the caveat that if he or she does not feel comfortable answering any question, he or she may leave it blank. Also, certain essay questions ask that the child view a situation from his or her own perspective in responding to the question or statement. However, the child is not required to give any specific personal information proscribed by the above Act.

We now turn to the Tripletts' constitutional claims. The Establishment Clause of the United States Constitution and its counterpart of the Kentucky Constitution guarantee that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which establishes state religious faith or tends to do so. *Lee v. Weisman*, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992); U.S.C.A. Const. Amends. §§ 1, 14; Ky. Const. §§ 1, 5. The Free Exercise Clause of both constitutions prevents the government from regulating one's religious beliefs. U.S.C.A. Const. Amend. §§ 1, 14; Ky. Const. §§ 1, 5. In *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the United States Supreme Court applied the following three-part test in deciding whether the Establishment Clause had been violated:

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, *Board of Education v. Allen*, 392 U.S. 236, 243, 88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060 (1968); finally, the statute must not foster "an excessive government entanglement with religion." [*Walz v. Tax Commission of City of New York*, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970)].

*Lemon v. Kurtzman*, 403 U.S. at 612–613, 91 S.Ct. at 2111–12.

In reviewing the KIRIS exam in light of KERA, we see that the exam has the secular legislative purpose provided for in KRS 158.6453(1), "to ensure school accountability for student achievement of the goals set forth in KRS 158.645." In reviewing the content of the KIRIS exam questions in the record, we do not see that the exam advances or inhibits religion, nor that it fosters any government entanglement with religion. While some questions contain pop culture references, humorous elements, or touch on current and/or controversial events or issues, we fail to see how they could be interpreted as attempting to promote or influence religious beliefs or send any message regarding religious beliefs.

In adjudging that the content of the KIRIS exam itself does not violate the Establishment Clause, we must do so from our own concept of religion, and we do not presume to question the genuineness of the Tripletts' claims that the KIRIS exam offends their religious and moral sensibilities. Nevertheless, not every state action implicating religion is invalid if one or a few citizens find such an action offensive. *Lee v. Weisman*, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992). So long as the state action does not, by any realistic measure, create any of the dangers which the First Amendment was designed to protect and does not so directly or substantially involve the state in religious exercises or in the favoring of a religion as to have a meaningful and practical impact, there is no First Amendment violation. *Lee v. Weisman, supra.*

In *Smith v. Board of School Commissioners of Mobile County*, 827 F.2d 684 (11th Cir.1987), plaintiffs objected to the school's use of certain home economics, history and social studies textbooks on grounds that they advanced certain religious beliefs and, thus, violated the Establishment Clause. The Court upheld the use of the books and held that the government action must amount to an endorsement of religion in order for the government's conduct to have the primary effect of advancing religion in violation of the Establishment Clause. The Court further stated that it is not sufficient that the government action merely accommodates religion or confers an indirect, remote, or incidental benefit on a particular religion or happens to harmonize with the tenets of a religion. Similarly, in *Mozert v. Hawkins County Board of Education*, 827 F.2d 1058

(6th Cir.1987) *cert. denied* by 484 U.S. 1066, 108 S.Ct. 1029, 98 L.Ed.2d 993 (1988), parents objected to a school's requirement that children read from a particular textbook they found offensive to their religious beliefs. The Court held that absent any proof that a student was ever called upon to say or do anything that required the student to affirm or deny a religious belief or to engage or refrain from engaging in any act required or forbidden by the student's religion, there was no violation of their right to free exercise of religion. Even assuming that some KIRIS exam questions do conflict with certain religious beliefs held by the Tripletts, the exam clearly does not have the primary effect of advancing religion, nor do the questions require the students to affirm or deny any religious belief.

In *Rawlings v. Butler*, Ky., 290 S.W.2d 801 (1956), an action was brought against a public school because nuns who were teaching at the school were allowed to dress in religious habit and wear symbols of their religion. The Court held there was no First Amendment violation because the nuns did not inject religion or the dogma of their church into what they taught. Paraphrasing from a concurring opinion of Justice Jackson of the United States Supreme Court in *People of State of Ill. ex rel McCollum v. Board of Education of School Dist. No. 71.*, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948), the Court stated:

> He further states there are 256 separate and substantial religious bodies in this country and if we are to eliminate everything that is objectionable to any of these warring sects, or that which is inconsistent with their doctrines, "we will leave public education in shreds." [333 U.S. at 235–37, 68 S.Ct. at 477.]

*Rawlings v. Butler*, Ky., 290 S.W.2d at 805.

Even if the governmental action substantially burdens a religious practice, if it is justified by a compelling state interest, it survives a free exercise of religion challenge. *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). The First Amendment does not prevent the government from regulating behavior associated with religious beliefs. *United States v. Lee*, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982).

In *Employment Division, Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 879, 110 S.Ct. 1595, 1600, 108 L.Ed.2d 876 (1990), the Court held the "right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Quoting United States v. Lee*, 455 U.S. at 263, 102 S.Ct. at 1058–59. In *Smith, supra*, a showing of a compelling state interest was not required because the law was valid and neutral and of general applicability. As to whether a strict scrutiny analysis is required in the instant case, we turn to the case of *Vandiver v. Hardin County Board of Education*, 925 F.2d 927 (6th Cir.1991) for guidance.

In *Vandiver, supra*, a student in Kentucky who had been in a home study program sought to transfer to a public school, and the public school required the transferee to pass an equivalency exam in order to gain credit for the school work performed in the home study program, pursuant to 704 KAR 3:307 § 2. The student objected to the testing requirement on rather tenuous religious grounds (studying for the test required more work than God would want him to bear). Nevertheless, the Court considered his claim, as it did not question the sincerity of his religious convictions. Relying heavily on *Smith, supra*, the Court found that the regulation at issue was generally applicable and religion-neutral such that a strict scrutiny analysis was unnecessary. However, in dicta, the Court went on to further interpret *Smith, supra*, and stated that if the statute not only affects the free exercise of religion, but also burdens other constitutionally protected rights such as that of a parent to direct the education and upbringing of his children, the claim remains subject to strict scrutiny. Thus, although we deem the KIRIS testing requirement in the instant case to be generally applicable and religion-neutral, we shall nevertheless proceed with a strict scrutiny analysis since the Tripletts addition-

ally claim that their parental rights have been violated.

The basis of the Court's ruling in *Rose v. Council for Better Education, Inc.*, Ky., 790 S.W.2d 186 (1989) is that education is a fundamental right in Kentucky and that the government must provide an efficient system of common schools that would be substantially uniform throughout the state and afford equal educational opportunities to every child within the state. If a constitutionally efficient educational system is one that is uniform and provides equal opportunities, there must be a way to measure whether all students are receiving equal opportunities beyond simply the resources that are being provided. The performance-based assessment process mandated by KERA is such a measuring device. Our Supreme Court has recognized the importance of statewide assessment of all schools in *Board of Educ. of Boone County v. Bushee*, Ky., 889 S.W.2d 809 (1994), wherein the Court attempted to clarify the responsibilities of the State Board, the local school boards and school councils under KERA. The Court stated:

> Other responsibilities of the State Board are directed in KRS 158.6453. These directives primarily focus on the need for statewide assessment of the achievements of each local institution in terms of the stated statewide objectives. These reflect the need for statewide accountability for achievement of outlined objectives.

> .  .  .  .  .

These responsibilities clearly reflect that area of education that most effectively rests at the statewide level. In order to assess the overall success of the educational reforms, the legislature recognized that it is imperative that a body representing statewide interests be held accountable for establishing a system whereby these objectives can best be achieved. Further, the statute recognizes that each individual school will be held accountable to the State Board for its performance. Also reflective of this structural approach are the mandates of KRS 158.6455 which require the State Board to "establish a system of de-

termining successful schools and dispensing appropriate rewards."
*Id.* at 813.

It appears that there is no higher priority in Kentucky at the present time than education. Therefore, the state's interest in the improvement of our educational system through the use of an assessment program such as the KIRIS exam is sufficiently compelling to require all students to take the KIRIS exam. We do not see how an assessment process can measure performance in terms of educational equality and progress unless all students are required to take the exam.

■ We now move on to the Tripletts' claims regarding the KIRIS assessment process. They maintain that the KIRIS exam is subjective and arbitrary and, therefore, lacks reliability in that it does not measure either the child's or the school's performance accurately. One complaint in particular is that the exam should be completely multiple choice. (The exam contains multiple choice, open-response and essay questions.) Both sides have submitted affidavits of experts stating their positions on the KIRIS exam. While the KIRIS assessment exam may not be perfect (doubtless, no testing process is), we are not being called upon, and indeed it is not our place, to pass on the relative merits and flaws of the exam. Rather, it is our responsibility only to adjudge whether its requirement rises to the level of a constitutional or statutory violation. We hold that it does not.

■ The final issue before us is the school's appeal of the court's rulings that the KIRIS exam must be open for public inspection. The Tripletts contend that the public should be allowed unfettered examination of such exams.

KRS 61.878(1)(g) provides the following exemption from the Kentucky Open Records Act (KRS 61.870–61.884):

(1) The following public records are excluded from the application of KRS 61.870 to 61.884 and shall be subject to inspection only upon order of a court of competent jurisdiction, except that no court shall authorize the inspection by any party of any

materials pertaining to civil litigation beyond that which is provided by the Rules of Civil Procedure governing pretrial discovery.

. . . .

(g) Test questions, scoring keys, and other examination data used to administer a licensing examination, examination for employment, or academic examination before the exam is given or if it is to be given again[.]

Assuming the KIRIS exam about which the Tripletts complain will be administered again in the future, the KIRIS exam clearly falls within the above-stated exemption even in view of the strict construction requirement in KRS 61.871.[1] However, the lower court bypassed the statute and, instead, applied a balancing test, finding that "[a]ny prejudice the Defendants may incur because of this public disclosure is far outweighed by the public's need to know."

Recently, the Supreme Court of Iowa was faced with the same issue in *Gabrilson v. Flynn,* 554 N.W.2d 267 (Iowa 1996), when a local school board member sought to make public a high school assessment test. The Court declined to apply a balancing test, reasoning that there was no indication that the legislature intended such a balancing of interests since they specifically excepted examinations from the open records law. Hence, the Court ruled that the assessment exam was not covered by the open records law and could not lawfully be disclosed.

The Tripletts argue that KRS 61.878(1) authorizes the court to order that the KIRIS exam be made open for public inspection. The language of the statute does allow a court of competent jurisdiction the authority to order an exempted record to be open for inspection. However, a court does not have unbridled discretion in exercising that authority, and we believe the lower court abused its discretion in the present case when it ordered the KIRIS exam open for public viewing. Given the importance of the KIRIS exam as a tool for measuring the efficiency and improvement of our schools as we have previously discussed in this opinion, and its potential for abuse, we believe the KIRIS exam should not be open for general public viewing without a special showing of necessity beyond simple curiosity as to its content. In our view, permitting the exam to be indiscriminately viewed by the public would interfere with the accomplishment of the objectives for which it was devised. It would certainly jeopardize the integrity and reliability of the exam. However, where, as here, there are specific allegations about the exam that are the subject of a lawsuit, the court could properly order the exam open for limited viewing for purposes of the litigation. Accordingly, the court's orders requiring the KIRIS exam to be open for public inspection are reversed and the cause remanded for an order sealing the portions of the record containing the KIRIS exam questions.

■ The Tripletts also argue that they, as parents, have a right to view the KIRIS exam under the following provision of 20 U.S.C.A. § 1232h(a) of the Hatch Amendment:

All instructional materials, including teacher's manuals, films, tapes, or other supplementary material which will be used in connection with any survey, analysis, or evaluation as part of any applicable program shall be available for inspection by the parents or guardians of the children.

In reading the above provision, we do not believe that an assessment exam such as the KIRIS exam falls within its purview. Although the KIRIS exam is a requirement for promotion and graduation, it is not a part of the student's regular curriculum and has no instructional purpose.

For the reasons stated above, the judgment of the Livingston Circuit Court is affirmed in part, and reversed and remanded in part for proceedings consistent with this opinion.

All concur.

---

1. Once the test is given *and* if it will not be administered again, KRS 61.878(1)(a) does not apply.