J. Barrett HYMAN, M.D., Plaintiff,

v.

The CITY OF LOUISVILLE, et al., Defendants.

Civ.A. No. 399CV597S.

United States District Court, W.D. Kentucky, at Louisville.

March 21, 2001.

Jay Alan Sekulow, Atlanta, GA, Francis J. Manion, American Center for Law &

Justice–Midwest, New Hope, KY, for plaintiff, J. Barrett Hyman, M.D.

William C. Stone, Thomas Gregg Lukins, Barbara E. Elliott, City Law Department, Louisville, KY, for defendants, City of Louisville, David Armstrong, Mayor of City of Louisville, Louisville and Jefferson County Human Relations Commission, Phyllis Atiba Brown, Executive Director of the Louisville and Jefferson County Human Relations Commission.

Stuart L. Adams, Jr., Louisville, KY, for defendants, Jefferson County, Kentucky and Rebecca Jackson, Jefferson County Judge/Executive.

Jonathan C. Hardy, Priddy Isenberg, Miller & Meade, Louisville, KY, David A. Friedman, American Civil Liberties Union of Kentucky, Louisville, KY, Michael Adams, Leslie Cooper, Matthew Coles, American Civil Liberties Union Foundation, New York City, for intervenor defendants, Fairness Campaign, Dan Farrell, and Diane Moten.

Meredith L. Burrell, Aaron D. Schuham, Janie Allison Sitton, United States Department of Justice, Civil Rights Division, Washington, DC, for amicus, United States of America.

### *MEMORANDUM OPINION*

SIMPSON, Chief Judge.

In February of 1999, the City of Louisville amended its Code of Ordinances so as to prohibit, in connection with employment, discrimination "because of . . . sexual orientation or gender identity. . . ."[1] In October of that same year, Jefferson County, Kentucky, which is comprised of the City of Louisville as well as other cities and unincorporated areas, amended its Code of Ordinances somewhat more broadly, prohibiting discrimination on the basis of gender identity or sexual orientation not only in connection with employment, but

---

1. *See generally* Lou.Code Ord. §§ 98.00, .15– .21 ("the City Ordinance").

also with access to housing and public accommodations.[2]

In addition to the general prohibitions set forth above, both ordinances contain provisions which prohibit employers from, *inter alia*, publishing any advertisement relating to employment which indicates a preference based upon gender identity or sexual orientation. *See* Lou.Code Ord. § 98.17(D); Jeff.Co.Code Ord. § 92.06(E). Both ordinances also prohibit any person from inciting another to violate the substantive provisions of the ordinances. *See* Lou.Code Ord. § 98.17(F)(2); Jeff.Co.Code Ord. § 92.16(B). Finally, both ordinances contain identical exemptions which state that the ordinances "in regard to sexual orientation or gender identity shall not apply to a religious institution, or to an organization operated for charitable or educational purposes, which is operated, supervised, or controlled by a religious corporation, association or society." Lou. Code Ord. § 98.00; Jeff.Co.Code Ord. § 92.07(B).

The plaintiff, J. Barrett Hyman, M.D. ("Dr.Hyman") is a physician whose medical practice is said to be located in the City of Louisville. Thus, both the City and the County Ordinances may apply to him in the conduct of the employment function of his business as a medical practitioner.[3] Contending that his religious beliefs so conflict with the ordinances' proscriptions that he will not comply with them and that

he thus risks prosecution on account of his religion, Dr. Hyman filed this action seeking to have the ordinances declared invalid insofar as they pertain to employment discrimination on the basis of sexual orientation and gender identity.

The Fairness Campaign, a political action group, advocated the adoption of the changes to the ordinances and conducted a public campaign in support of its position at the times the City and the County legislative bodies were considering the amendments they eventually enacted. It, together with Dan Ferrell and Diane Moten, two self-described homosexuals, were allowed to intervene permissively. *See* DN 19. The United States, by its Department of Justice, was granted *amicus curiae* status. *See* DN 46. All parties[4] have moved for summary judgment. We now address these motions.

## STANDARD OF REVIEW

A motion for summary judgment will be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). According to the Supreme Court, the standard is "whether the evidence presents a sufficient disagreement to require submission to a

---

2. *See* Jeff.Co.Code Ord. §§ 92.01–.25 ("the County Ordinance").

3. The City of Louisville and Jefferson County are currently litigating the issue of which ordinance applies within the Louisville city limits. By order entered on March 13, 2000, Judge Stephen Ryan of the Jefferson Circuit Court held that the County Ordinance "is valid and enforceable throughout the unincorporated portions of Jefferson County, but is not enforceable within the incorporated portions of Jefferson County." However, Judge Ryan's decision is currently before the Kentucky Court of Appeals. Because the challenged portions of both ordinances are not materially different, and because with respect to conduct related to employment such as advertising, there may be some boundary line

overlap, we will address both the City and the County Ordinances.

4. For the sake of convenience, the City of Louisville, David Armstrong in his official capacity as the Mayor of the City of Louisville, the Louisville and Jefferson County Human Relations Commission, and Phyllis Atiba Brown in her official capacity as the Executive Director of the Louisville and Jefferson County Human Relations Commission will be referred to collectively herein as the "City Defendants." Jefferson County and Rebecca Jackson in her official capacity as Jefferson County Judge/Executive will be referred to as the "County Defendants." Finally, the Fairness Campaign, Dan Farrell, and Diane Moten will be referred to collectively as the "Intervenor–Defendants."

jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Faced with a motion for summary judgment, the nonmoving party must come forth with requisite proof to support its legal claim, particularly where the opposing party has had an opportunity to conduct discovery. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In the Sixth Circuit, "[t]he 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). "[T]his standard requires a court to make a preliminary assessment of the evidence, in order to decide whether the plaintiff's evidence concerns a material issue and is more than *de minimis.*" *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir.1996).

When faced with cross-motions for summary judgment, a district court is authorized to " 'assume that there is no evidence which needs to be considered other than that which has been filed by the parties.' " *Greer v. United States*, 207 F.3d 322, 326 (6th Cir.2000) (quoting *Harrison Western Corp. v. Gulf Oil Co.*, 662 F.2d 690, 692 (10th Cir.1981)). However, the standards upon which the court evaluates the motions for summary judgment do not change. *See Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (citing *Home for Crippled Children v. Prudential Ins. Co.*, 590 F.Supp. 1490, 1495 (W.D.Pa.1984)). Instead, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft Broadcasting*, 929 F.2d at 248 (citations omitted).

## DR. HYMAN'S CONTENTIONS

Dr. Hyman alleges that he "believes that acts of homosexuality, bisexuality, transgenderism and other departures from monogamous heterosexual relations are sinful and grievously offensive to God." Am. Compl. at ¶ 10. He contends that his beliefs are inconsistent with the requirements of both the City and the County Ordinances and that because of his religious beliefs, he "will deny employment and discharge certain persons on the basis of sexual orientation and/or gender identity...." Am.Compl. at ¶ 20. Therefore, Dr. Hyman claims that he is faced with the "Hobson's choice" of either obeying the laws of Louisville and Jefferson County or obeying the laws of his conscience.

Dr. Hyman further states that in recent months he attempted to place in the Courier–Journal, a Louisville newspaper, an advertisement which purportedly violates both ordinances. He asserts that the newspaper would not allow his ad to be placed because of its "discriminatory" content. *See* Pl.'s Mot. Supplement R., Ex. A (DN 52) ("Hyman Affidavit").

Finally, Dr. Hyman indicates that he is in the process of hiring a new employee. *See id.* As a part of the hiring process, Dr. Hyman is said to have inquired into two applicants' sexual orientation intending to take this fact into account in reaching an employment decision.

Dr. Hyman claims that the ordinances deprive him of rights protected by the United States Constitution in violation of 42 U.S.C. § 1983. *See* Am.Compl. at ¶ 29–55. In addition, he contends that the ordinances violate the Kentucky Constitution and several statutes of the Commonwealth of Kentucky. *See id.* at ¶¶ 56–85. He seeks, *inter alia*, declaratory relief pursuant to 28 U.S.C. §§ 2201, 2202.

Each of these contentions, as well as the defendants' responses thereto, will be discussed below.

## DISCUSSION

### I. Standing & Ripeness

The City Defendants initially argue that Dr. Hyman lacks standing to challenge the

constitutionality of the ordinances.[5] In the alternative, the City Defendants contend that despite the plaintiff's proper standing, his claims are not presently ripe for adjudication.

### A. Standing

■ Disputes between parties must constitute actual "cases" or "controversies" to be cognizable by a federal court. U.S. Const. art. III, § 2. The standing doctrine implements this limitation on federal judicial power. In order to have standing to assert a claim, a plaintiff is required to demonstrate that he or she has "suffered an injury-in-fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Peoples Rights Organization, Inc. v. City of Columbus,* 152 F.3d 522, 527 (6th Cir.1998) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). In this case, the parties' briefs indicate that the sole aspect of the standing doctrine in dispute is whether Dr. Hyman has suffered an "injury-in-fact" as required by Article III. Therefore, we focus our inquiry on this point and assume there is no dispute that Dr. Hyman has sufficiently demonstrated the causation and redressability aspects of the standing inquiry.

An injury-in-fact for the purposes of Article III is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent', not 'conjectural' or 'hypothetical.'" *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130 (citations omitted). In order to have standing to bring suit, an individual must demonstrate that he or she " 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct...." *Kardules v. City of Columbus,* 95 F.3d 1335, 1347 (6th Cir.1996) (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 101–102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). Finally, the injury must "affect the plaintiff in a personal and individual way." *Lujan,* 504 U.S. at 560 n. 1, 112 S.Ct. 2130.

Dr. Hyman seeks pre-enforcement relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202. *See* Am.Compl. at ¶ 1. A declaratory judgment action brought prior to the completion of an injury-in-fact is, nevertheless, proper if the plaintiff can "demonstrate actual present harm or a significant possibility of future harm...." *Peoples Rights Organization,* 152 F.3d at 527 (citing *National Rifle Ass'n v. Magaw,* 132 F.3d 272, 279 (6th Cir.1997)). In other words, an individual need not "await the consummation of threatened injury to obtain preventive relief." *Peoples Rights Organization,* 152 F.3d at 527. The injury must only be "certainly impending." *Id.* (citing *Babbitt v. United Farm Workers Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)).

Dr. Hyman alleges that he is "president" of a medical practice in which another physician is also a shareholder. *See* Am.Compl. at ¶ 4. Dr. Hyman also contends that this practice is in the process of being dissolved, after which he will be in business alone. Dr. Hyman's affidavit indicates that he is seeking to fill an opening on his staff left by a departing employee. He states that in the process of hiring a new staff member, he has inquired into the sexual orientation of applicants with the intention of excluding those applicants who state that their sexual relationships are not monogamous heterosexual relationships. Finally, Dr. Hyman contends that he has attempted to place an advertisement in the Courier–Journal newspaper which allegedly violates both ordinances. The Courier–Journal allegedly refused to print the ad-

---

**5.** The County Defendants make no argument with regard to either the plaintiff's standing or the ripeness of the plaintiff's claims. *See* County Defs.' Mot.Summ.J. at 33 (DN 35) (hereinafter "the County MSJ"). The Intervenor–Defendants also do not contest these issues.

vertisement because it was "discriminatory." *See generally*, Hyman Affidavit.[6]

Based on these allegations, and the absence of dispute as to their truthfulness, we find that Dr. Hyman has standing to bring this action against the defendants. The relevant inquiry is whether or not the ordinances would be enforced by the respective enacting authorities should Dr. Hyman violate them. The record unambiguously indicates that the ordinances will be enforced if they are violated. *See* City Defs.' Answer at ¶ 16; County Defs.' Answer at ¶ 15. As the Supreme Court held in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967):

> Where the legal issue presented is fit for judicial resolution, and where a regulation requires an immediate and significant change in the plaintiff's conduct of their affairs with serious penalties attached to their noncompliance, access to the courts under the ... Declaratory Judgment Act must be permitted....

*Id.* at 153, 87 S.Ct. 1507.

Here, the legal issue of whether the City Ordinance and the County Ordinance are constitutional is "fit" for judicial resolution. These ordinances appear to require "an immediate and significant change in the plaintiff's conduct" of his affairs if he is to avoid liability for noncompliance. This is not a situation involving " 'the mere existence of a statute ... which may or may not ever be applied to plaintiffs....' " *National Rifle Ass'n of America v. Magaw*, 132 F.3d at 293 (quoting *Stoianoff v. Montana*, 695 F.2d 1214, 1223 (9th Cir.1983)). To the contrary, the record suggests that the ordinances will be enforced against all secular employers who discriminate on the basis of sexual orientation or gender identity. Dr. Hyman's claim is also more than " 'a generalized grievance' shared in substantially equal measure by ... a large class of citizens...." *Magaw, supra*, at

294 (quoting *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). Rather, Dr. Hyman is "put ... in a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate." *Abbott Labs.*, 387 U.S. at 152, 87 S.Ct. 1507. Therefore, we find that Dr. Hyman has standing to raise his claims.

### B. Ripeness

■ While the focus of a standing inquiry is whether the plaintiff is the proper party to litigate a particular issue, a court faced with a question of ripeness must determine whether a particular challenge has been brought at the proper time. *See National Rifle Ass'n of America v. Magaw*, 132 F.3d at 284. A court must consider several factors in determining whether issues before it are ripe for adjudication. The two primary factors to be balanced are "the hardship to the parties of withholding court consideration," and "the fitness of the issues for judicial decision." *Abbott Labs. v. Gardner*, 387 U.S. at 149, 87 S.Ct. 1507.

In the context of a First Amendment pre-enforcement challenge of a statute or ordinance brought pursuant to the Declaratory Judgment Act, the ripeness inquiry:

> usually focuses on how imminent the threat of prosecution is and whether the plaintiff has sufficiently alleged an intention to refuse to comply with the statute in order to ensure that the fear of prosecution is genuine and the alleged chill on First Amendment rights is concrete and credible, and not merely imaginative or speculative.

*Magaw, supra*, at 284–85 (citations omitted).

In *Michigan State Chamber of Commerce v. Austin*, 788 F.2d 1178 (6th Cir.1986), the Sixth Circuit noted the difficulty of such determinations:

---

**6.** None of the defendants attempt to refute any of the allegations made by Dr. Hyman in his affidavit.

In declaratory judgment actions it is often difficult to draw a line between actual controversies and attempts to obtain advisory opinions on the basis of hypothetical controversies.... "The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."
*Id.* at 1181 (quoting *Golden v. Zwickler*, 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969)).

Faced, as we are, with the City Defendants' contention that Dr. Hyman's challenge of the ordinances is not yet ripe for adjudication, we focus our inquiry on "how imminent the threat of prosecution is and whether the plaintiff has sufficiently alleged an intention to refuse to comply with the statute...." *Magaw*, 132 F.3d at 284–85. Informing our consideration are the facts alleged by the parties concerning "the hardship to the parties of withholding court consideration" and "the fitness of the issues for judicial decision." *Abbott Labs.*, 387 U.S. at 149, 87 S.Ct. 1507.

The City Defendants allege that: (1) Dr. Hyman has not violated the ordinances and that it is unlikely he will ever be confronted with a situation in which he could violate the ordinances; (2) even if Dr. Hyman has violated the ordinances, there is no imminent threat of prosecution against him; and (3) even assuming Dr. Hyman has violated the ordinances and that there is a possibility of being prosecuted under them, he would not suffer a hardship if his pre-enforcement claim is not heard. *See* City Defs.' Mot. Summ.J.(DN 38) (hereinafter "the City

MSJ") at 12. Based on the record before us, as supplemented by the Hyman Affidavit, and as discussed below, we find that Dr. Hyman has sufficiently demonstrated that his claim is ripe for adjudication by this court.

Dr. Hyman need not demonstrate that he has violated, or could violate, the ordinances in question. Indeed, the primary purpose of a pre-enforcement challenge such as the one brought by the plaintiff is to obtain a declaration of rights without risking prosecution under the substantive statute being challenged. *See, e.g., Steffel v. Thompson*, 415 U.S. 452, 462, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) ("[A] refusal on the part of the federal courts to intervene when no state proceeding is pending may place the hapless plaintiff between the Scylla of intentionally flouting state law and the Charybdis of forgoing what he believes to be constitutionally protected activity...."). Dr. Hyman's affidavit indicates that he has inquired into the sexual orientation of two job applicants with the intention of excluding those applicants who engage in sexual relationships which are not heterosexual and monogamous. Also, Dr. Hyman states that he has attempted to place an advertisement in a local newspaper which may be discriminatory in violation of the ordinances. Finally, neither the City Defendants nor the County Defendants have indicated that were Dr. Hyman to violate the ordinances they would refrain from enforcing the ordinances against him. In fact, the City and the County have stated in their pleadings that they intend to enforce the ordinances as a matter of course. *See* City Defs.' Answer at ¶ 16; County Defs.' Answer at ¶ 15.

Courts have often found that a plaintiff's pre-enforcement challenge is ripe if he or she has stated an intent not to comply with the mandate of the statute, and the appropriate authority has expressed an intent to enforce that statute. *See, e.g., Doe v. Bolton*, 410 U.S. 179, 188–89, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); *Michigan State Chamber of Commerce v. Austin*, 788 F.2d

1178, 1184–85 (6th Cir.1986). Therefore, these allegations by Dr. Hyman, and the defendants' failure to refute them, are sufficient to justify our conclusion that "a real, substantial controversy" exists between the parties that is "definite and concrete, not hypothetical or abstract." *Babbitt v. United Farm Workers Nat. Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) (quoting *Railway Mail Ass'n v. Corsi,* 326 U.S. 88, 93, 65 S.Ct. 1483, 89 L.Ed. 2072 (1945)).

The City Defendants further argue that Dr. Hyman will not be prejudiced by a delay in having his claim adjudicated. The "hardship" listed above as a factor to be considered in the ripeness calculus refers to "the hardship to the parties of withholding court consideration" at this time. *Abbott Labs.,* 387 U.S. at 149, 87 S.Ct. 1507. This aspect of the inquiry "turns upon whether the challenged action creates 'a direct and immediate' dilemma for the parties." *El Dia, Inc. v. Hernandez Colon,* 963 F.2d 488, 495 (1st Cir.1992) (citation omitted). As supplemented by his most recent affidavit, the record indicates that Dr. Hyman is faced with such a dilemma. Indeed, Dr. Hyman has stated that he does not intend to obey the mandates of the ordinances.

The City Defendants maintain that Dr. Hyman's claims would be more suitable for adjudication when his potential injury as a result of enforcement of the ordinances is more imminent. However, the only difference between hearing his claim now and entertaining it at a later date is that once Dr. Hyman actually violates the ordinances, he may be subject to fines by the City or the County and to civil actions by those against whom he discriminates. We believe such possibility constitutes "hardship" within the meaning of the Supreme Court's holding in *Abbott Labs. See also Kardules v. City of Columbus,* 95 F.3d

1335, 1344 (6th Cir.1996) ("The Supreme Court typically has found hardship when enforcement of a statute or regulation is inevitable and the sole impediment to ripeness is simply a delay before the proceedings commence."). We conclude that Dr. Hyman has standing to assert his claims and that his claims are ripe for adjudication.

## II. Free Exercise of Religion

■ Dr. Hyman makes a unique argument in support of his Free Exercise Clause claim. The basis of his challenge is that the ordinances allegedly prefer religious institutions over individuals. Dr. Hyman claims that the ordinances violate both the First Amendment of the U.S. Constitution and § 5 of the Kentucky Constitution.

### A. U.S. Const. amend. I

The First Amendment states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. amend. I. This clause is made applicable to the states and their instrumentalities by the Fourteenth Amendment. *See Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Dr. Hyman claims that his right to the free exercise of his religion is violated by the ordinances he challenges. *See* Am.Compl. at ¶ 32. Specifically, he argues that the ordinances impermissibly distinguish between individuals who, based on their religious beliefs, seek to make employment decisions on the basis of sexual orientation or gender identity and religious institutions with the same intentions.[7] *See* Pl.'s Mot. Summ.J. at 20 (DN 31) (hereinafter the "Hyman MSJ"). While the ordinances make no denominational distinctions, Dr. Hyman contends that provisions which ex-

---

7. Both the City and the County Ordinances contain identical exemptions which state that the ordinances "in regard to sexual orientation or gender identity shall not apply to a religious institution, or to an organization op-

erated for charitable or educational purposes, which is operated, supervised, or controlled by a religious corporation, association or society." Lou.Code Ord. § 98.00; Jeff.Co.Code Ord. § 92.07(B).

empt religious institutions and fail to exempt individuals with comparable religious convictions are at odds with the Free Exercise Clause of the First Amendment.

In *Employment Div., Dept. of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), the Supreme Court set forth a framework for the analysis of free exercise claims such as this. *Smith* requires a court to determine as a threshold matter whether the challenged regulation[8] is "a 'valid and neutral law of general applicability[.]' " *Smith,* 494 U.S. at 879, 110 S.Ct. 1595 (quoting *United States v. Lee,* 455 U.S. 252, 263 n. 3, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) (Stevens, J., concurring in judgment)). If the challenged regulation is religion-neutral and generally applicable, then it does not violate the Free Exercise Clause even if its enforcement results in an incidental burden on a particular religious practice. *See Smith* at 884–85, 886 n. 3, 110 S.Ct. 1595. However, regulations found to be either nonneutral or not generally applicable are further scrutinized by courts.[9] These regulations "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Church of the Lukumi Babalu Aye, Inc.,* 508 U.S. at 531–32, 113 S.Ct. 2217. *See also Kissinger v. Board of Trustees of Ohio State University, College of Veterinary Medicine,* 5 F.3d 177, 179 (6th Cir.1993).

Both the City and the County Ordinances generally prohibit employment discrimination on account of gender identity or sexual orientation.[10] However, as noted above, both ordinances contain exemptions which do not prohibit religious institutions from discriminating on the same bases. Dr. Hyman contends that the distinction between religious institutions and individuals destroy the neutrality and general applicability of the ordinances just as surely as would an exemption with a denominational preference. *See* Hyman MSJ at 20–21. In support of this contention, Dr. Hyman argues that the ordinances are facially discriminatory.

The Supreme Court has stated that a law is not neutral if its purpose "is to infringe upon or restrict practices because of their religious motivation." *Lukumi,* 508 U.S. at 533, 113 S.Ct. 2217. Evidence of a law's neutrality may come from several sources. *See id.* At a minimum, the text of a statute must not be discriminatory. As the *Lukumi* Court stated, "[a] law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Lukumi* at 533, 113 S.Ct. 2217. For example, in *Lukumi,* the Court addressed a situation in which a series of local ordinances effectively outlawed the ritual of animal sacrifice practiced by followers of Santeria. While the Court ultimately

8. In *Smith,* the Court analyzed the Free Exercise Clause implications of the enforcement of a criminal statute which prohibited the use of peyote. However, subsequent lower court decisions have made clear that the *Smith* framework applies in both the civil and criminal contexts. *See, e.g., Vandiver v. Hardin County Bd. of Educ.,* 925 F.2d 927, 932 (6th Cir. 1991); *Salvation Army v. Department of Community Affairs of N.J.,* 919 F.2d 183, 195 (3rd Cir.1990).

9. The Court has held that "[n]eutrality and general applicability are interrelated, and ... failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 531, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993).

10. The City Ordinance defines "gender identity" as either "(A) Having a gender identity as a result of a sex change surgery; or (B) Manifesting, for reasons other than dress, an identity not traditionally associated with one's biological maleness or femaleness." Lou.Code Ord. § 98.16. It defines "sexual orientation" as "an individual's actual or imputed heterosexuality, homosexuality, or bisexuality." *Id.*

The County Ordinance defines "gender identity" as "[m]anifesting an identity not traditionally associated with one's biological maleness or femaleness." Jeff.Co.Code Ord. § 92.02. It defines "sexual orientation" as "[a]n individual's actual or imputed heterosexuality, homosexuality or bisexuality." *Id.*

found the statutes to be facially neutral, it noted that the use of words like "sacrifice" and "ritual" in the ordinances was consistent with a claim of facial discrimination. *See id.*

We cannot agree with Dr. Hyman that the purpose of the ordinances' exemptions which he challenges is to "restrict practices because of their religious motivation." *See Lukumi, supra,* at 533, 113 S.Ct. 2217. The record does not support such a conclusion. The policy statements which accompany each ordinance weigh against it as well. *See* Lou.Code Ord. § 98.15; Jeff.Co. Code Ord. § 92.01. Also, neither the ordinances nor their accompanying exemptions refer to "religious practice." *Lukumi, supra,* at 533, 113 S.Ct. 2217. While discrimination against individuals on account of their sexual orientation or gender identity may be a religious practice for Dr. Hyman, the ordinances' prohibitions are textually and contextually secular.

Finally, the Supreme Court has consistently held that, while an individual's religious principles may be accommodated to a certain extent, it is necessary that "some religious practices yield to the common good." *U.S. v. Lee,* 455 U.S. 252, 259, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982). *See also Reynolds v. United States,* 98 U.S. 145, 166–67, 8 Otto 145, 25 L.Ed. 244 (1878) ("Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices."). Therefore, the ordinances may not, and do not, regulate the beliefs of Dr. Hyman. Rather, they merely seek to regulate the conduct of all individuals who are engaged in the employment of others. We believe that such a religion-neutral, generally applicable regulation is consistent with the mandate of the Free Exercise Clause of the First Amendment. *See United States v. Lee,* 455 U.S. at 261, 102 S.Ct. 1051 ("When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity.").

Having determined that the ordinances at issue are neutral laws of general applicability, we need not address whether they are justified by a compelling government interest and whether they are narrowly tailored to advance that interest. *See Smith,* 494 U.S. at 886 n. , 110 S.Ct. 15953. Rather, we must only be satisfied that the ordinances are rationally related to a legitimate government interest. *See Walz v. Tax Comm'n of City of New York,* 397 U.S. 664, 696, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) (applying an "equal protection mode of analysis" to claims brought under the First Amendment). As the Court held in *Romer v. Evans,* 517 U.S. 620, 632, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996), "a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." The Court also held that "[b]y requiring that the classification bear a rational relationship to an independent and legitimate legislative end, we ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Id.* at 633, 116 S.Ct. 1620 (citation omitted).

There is ample authority for the proposition that the elimination of discrimination on the basis of sexual orientation or gender identity is within the purview of legitimate legislative interests. *See, e.g., Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston,* 515 U.S. 557, 572, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995) (holding that laws which prohibit discrimination on the basis of sexual orientation in the provision of public accommodations are "well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination ..."). With respect to these ordinances, the record indicates that the legislative branches of the Louisville

and Jefferson County governments have chosen to balance the goal of nondiscrimination against a similarly valid goal of noninterference with religious institutions. We believe that the essential "link" between "the classification adopted and the object to be attained" is sufficient to justify our conclusion that the ordinances are rationally related to a legitimate government interest. *See Romer v. Evans,* 517 U.S. at 632, 116 S.Ct. 1620.

We conclude that the ordinances do not violate the Free Exercise Clause of the First Amendment of the U.S. Constitution.

### B. Ky. Const. § 5[11]

■ § 5 of the Kentucky Constitution states in relevant part that "[n]o human authority shall, in any case whatever, control or interfere with the rights of conscience." Dr. Hyman contends that this language must be interpreted to prohibit the City of Louisville and Jefferson County from expanding the scope of their antidiscrimination ordinances to include discrimination because of sexual orientation and gender identity. *See* Am. Compl. at ¶¶ 56–60.

In construing the Kentucky Constitution, we are normally bound by the decisions of the Kentucky appellate courts. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78–80, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Since that court has yet to face a challenge similar to that brought by Dr. Hyman, "we must predict how it would resolve the issue from 'all relevant data.'" *Kingsley Associates, Inc. v. Moll Plasti-Crafters, Inc.,* 65 F.3d 498, 507 (6th Cir. 1995) (quoting *Bailey v. V. & O Press Co., Inc.,* 770 F.2d 601, 604 (6th Cir.1985)). The Sixth Circuit has determined that sources to be consulted include, *inter alia,* "the decisional law of the state's lower courts, other federal courts construing state law, restatements of law, law review commentaries, and other jurisdictions on

the 'majority' rule in making this determination." *Meridian Mut. Ins. Co. v. Kellman,* 197 F.3d 1178, 1181 (6th Cir.1999) (citing *Grantham & Mann v. American Safety Prods.,* 831 F.2d 596, 608 (6th Cir. 1987)). Because our review of prior decisions by Kentucky courts reveals that they have repeatedly interpreted the Kentucky Constitution to be consistent with the U.S. Constitution with regard to issues of religious freedom, we need not look to other sources of "relevant data" to determine how the Supreme Court of Kentucky would interpret § 5.

A review of several decisions makes clear that Kentucky courts have looked to the United States Supreme Court for guidance in interpreting provisions of the Kentucky Constitution that deal with religious freedom. *See, e.g., Fiscal Court of Jefferson County v. Brady,* 885 S.W.2d 681, 686 (Ky.1994); *Triplett v. Livingston County Bd. of Educ.,* 967 S.W.2d 25, 31–33 (Ky.Ct. App.1997); *Kentucky Com'n on Human Rights v. Kerns Bakery, Inc.,* 644 S.W.2d 350, 352–53 (Ky.Ct.App.1982). The court's holding in *Triplett* is especially relevant to our determination.

In *Triplett,* the plaintiffs claimed that educational reforms undertaken by the state violated their right to freely exercise their religious beliefs. *See Triplett,* 967 S.W.2d at 31. In discussing the law applicable to both the state and federal constitutional challenges, the court stated that "[t]he Free Exercise Clause of *both* constitutions prevents the government from regulating one's religious beliefs." *Id.* (citing U.S. Const. amend. I, XIV; Ky. Const. §§ 1, 5) (emphasis supplied). In discussing the plaintiffs' religious objections to the challenged statute, the court cited, almost exclusively, U.S. Supreme Court authority, including the *Smith* decision discussed above which held that neutral laws of general applicability need not

---

11. Our jurisdiction to determine Dr. Hyman's state law claims is conferred by 28 U.S.C. § 1367(a).

be subjected to strict scrutiny review. *See Triplett*, 967 S.W.2d at 32.[12] Given this reliance by Kentucky courts upon U.S. Supreme Court precedent in construing constitutional provisions, as well as Dr. Hyman's failure to justify a contrary conclusion,[13] we find that the ordinances in question withstand Dr. Hyman's challenge premised upon § 5 of the Kentucky Constitution for the same reasons they withstand his Free Exercise Clause challenge.

## III. Free Speech

Dr. Hyman contends that two provisions of the ordinances he challenges infringe upon his free speech rights.[14] First, Dr. Hyman takes issue with the ordinances' prohibition against publishing any advertisement relating to employment which indicates a preference based upon gender identity or sexual orientation. *See* Lou. Code Ord. § 98.17(D); Jeff.Co.Code Ord. § 92.06(E). Second, he challenges those portions of the ordinances which prohibit any person from inciting another to violate the substantive provisions of the ordinances. *See* Lou.Code Ord. § 98.17(F)(2);

Jeff.Co.Code Ord. § 92.16(B). We will address each of these arguments in turn.

## A. The Advertising Restrictions

■ In future solicitations for employees, Dr. Hyman desires to articulate an intention to discriminate based upon gender identity and sexual orientation and an intention to not honor the ordinances. *See* Hyman Dep. (DN 27) at 49–50. He argues that the ordinances' prohibition on his ability to advertise his preferences violates his right to free speech.[15]

In his brief, Dr. Hyman acknowledges that the Supreme Court, in *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973), upheld a similar ordinance prohibiting gender-biased employment advertising in the face of a First Amendment challenge. *Pittsburgh Press*, therefore, appears to foreclose Dr. Hyman's challenge to the ordinances. However, he argues that we should hold otherwise for two reasons: (1) the advertisements at issue in *Pittsburgh Press* are distinguishable from his proposed adver-

**12.** The *Triplett* court nevertheless applied strict scrutiny analysis because the plaintiffs claimed that their parental rights were violated in addition to their free exercise rights. *See Triplett*, 967 S.W.2d at 32–33. However, we need not engage in a similar analysis of the ordinances challenged by Dr. Hyman for two reasons. First, the Sixth Circuit does not recognize a "hybrid-rights" exception to the general rule of *Smith. See Kissinger, supra*, 5 F.3d at 180. Second, as further discussed below, we find that the ordinances in question do not burden "other constitutionally protected rights...." *Triplett* at 32.

**13.** Dr. Hyman cites *Commonwealth v. Wasson*, 842 S.W.2d 487 (Ky.1992), for the proposition that "the state's constitution provides broader protection for individual liberties than does the federal constitution." Hyman MSJ at 26. However, *Wasson* addressed the right to privacy as it related to the state's prohibition of consensual sex involving two males. Therefore, the court's determination that the right of privacy embodied in the Kentucky Constitution is 13 greater than that which exists under the U.S. Constitution is irrelevant to the present controversy. If any-

thing, the *Wasson* decision supports the conclusion that the ordinances here in question are valid. *See Wasson, supra*, at 500 ("[Male and female homosexuals] are a separate and identifiable class for Kentucky constitutional law analysis because no class of persons can be discriminated against under the Kentucky Constitution.").

**14.** The Kentucky Constitution protects speech to the same extent as does the United States Constitution. *See McDonald v. Ethics Committee of the Kentucky Judiciary*, 3 S.W.3d 740, 743 (Ky.1999). Therefore, our decision with respect to Dr. Hyman's claims under federal law forecloses his free speech claims based upon state law.

**15.** Dr. Hyman claims to have attempted to place an ad in the Courier–Journal which read, "Pro–Life and Traditional Pro–Family office worker for billing, collections, and medical assistant. Fax resume to (502)587–6535 or call (502)583–5524." However, he alleges that he omitted the phrase "Pro–Life and Traditional Pro–Family" from the ad upon the Courier–Journal's refusal to print the original version. *See* Hyman Affidavit at ¶¶ 6–8.

tisements; and (2) the ordinances are unconstitutionally overbroad. We find Dr. Hyman's arguments unpersuasive and that *Pittsburgh Press* requires us to grant summary judgment in favor of the defendants.

### 1. Commercial Speech

The ordinance at issue in *Pittsburgh Press* forbade an employer from publishing "any notice or advertisement relating to 'employment' . . . which indicates any discrimination because of . . . sex." *Pittsburgh Press*, 413 U.S. at 378, 93 S.Ct. 2553. The Pittsburgh Commission on Human Relations found that the Pittsburgh Press had aided employers in violating the ordinance by publishing help wanted ads in separate columns titled "Male Help Wanted" and "Female Help Wanted." *See id.* at 379, 93 S.Ct. 2553. The Pittsburgh Press appealed the case to the Supreme Court claiming that the ordinance infringed upon its First Amendment rights. The case turned, principally, on whether the speech involved constituted commercial speech. The Court noted that the critical test for commercial speech was whether it "did no more than propose a commercial transaction, . . . ." *Pittsburgh Press* at 385, 93 S.Ct. 2553. The Court found that the advertisements in the Pittsburgh Press were merely proposals of possible employment, and therefore, were "classic examples of commercial speech." *Id.* at 385, 93 S.Ct. 2553.

Dr. Hyman argues that his advertisements are different in that he proposes "to make known his 'stand'" on the ordinances, although it is clear that he intends to do so in the context of soliciting applications from prospective employees. *See*

Hyman MSJ at 30; Hyman Dep. at 48. His proposed advertisements, he argues, would express his political and moral opinion on important public issues. He concludes, therefore, that they are larger than mere commercial speech and are worthy of the broadest protection available under the First Amendment.[16]

However, commercial speech is not worthy of broader First Amendment protection simply because it coexists with speech addressing important public issues. *See Central Hudson*, 447 U.S. at 563 n. 5, 100 S.Ct. 2343. Instead, advertisements can "constitute commercial speech notwithstanding the fact that they contain discussions of important public issues. . . ." *Bolger*, 463 U.S. at 67–68, 103 S.Ct. 2875. According to the Court, this conclusion is apt when the commercial speech and political statement are not "inextricably intertwined." *Board of Trustees of the State University of New York v. Fox*, 492 U.S. 469, 474, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989).

In *Fox*, the Court explained that "[n]o law of man or of nature makes it impossible to sell housewares without teaching home economics, or to teach home economics without selling housewares." *Fox*, 492 U.S. at 474, 109 S.Ct. 3028. The same is true of Dr. Hyman's proposed advertisements. Nothing requires him to express his opinions in his advertisements for employment. Including Dr. Hyman's political and moral views in his "Help Wanted" advertisements does no more to turn them into political speech than "opening sales presentations with a prayer or a Pledge of Allegiance would convert them into reli-

---

**16.** This is not to say that commercial speech is not afforded considerable First Amendment protection. To the contrary, the Supreme Court has noted that commercial speech is entitled to "substantial protection." *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 68, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983). · The first requirement of such speech, though, is that it concern lawful activity. *See Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York*, 447 U.S. 557, 100 S.Ct.

2343, 65 L.Ed.2d 341 (1980). Dr. Hyman's proposed speech concerns an activity, discriminating against prospective employees because of their sexual orientation and gender identity, which is made illegal by the ordinances. Therefore, if we find that his advertisements constitute commercial speech, they would not be entitled to First Amendment protection because the ordinances are not invalid legislative enactments.

gious or political speech." *Id.* at 475, 109 S.Ct. 3028. Because at their essence, Dr. Hyman's advertisements are proposals of possible employment, we hold that they constitute commercial speech. The language Dr. Hyman proposes to use is, accordingly, not shielded by the First Amendment.

## 2. Overbreadth

■ Dr. Hyman also argues that the ordinances are unconstitutional because they prohibit speech which is otherwise protected by the First Amendment. The Supreme Court has acknowledged that a plaintiff is permitted to make a facial challenge to a law when "it also threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985). However, we have previously recognized that a law "should be invalidated for overbreadth only as a last resort, and any overbreadth of a statute must be substantial before a statute is invalidated on its face." *United States v. Long*, 831 F.Supp. 582, 587 (W.D.Ky.1993) (citing *New York v. Ferber*, 458 U.S. 747, 769 n. 24, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982)). Also, we note that the overbreadth doctrine does not apply to commercial speech. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 496–97, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).

Dr. Hyman argues that the ordinances are overbroad in that they "effectively forbid all employers ... from printing or publishing any writings expressing criticisms of the Fairness Ordinances or of the hiring of homosexuals, bisexuals or transgendered individuals in general." Hyman MSJ at 32. While we agree with Dr. Hyman that such a prohibition would raise serious constitutional concerns, we do not accept his broad interpretation of the reach of the ordinances.

Because the ordinances have not been authoritatively construed by a state court, we should construe them in a manner that will avoid constitutional questions if such a reading is possible. *See Ferber*, 458 U.S. at 769 n. 24, 102 S.Ct. 3348. We find that these ordinances are readily susceptible to a construction which will avoid any overbreadth concern. Both ordinances limit liability to any "employer, labor organization, or employment agency" and state that a covered advertisement must be "for employment." Lou.Code Ord. § 98.17(D); Jeff.Co.Code Ord. § 92.06(E). We read the ordinances as only applying to advertisements soliciting job applications or proposing employment opportunities. As such, the ordinances are "classic examples of commercial speech." *Pittsburgh Press*, 413 U.S. at 385, 93 S.Ct. 2553. Because the ordinances only address commercial speech, we cannot apply the doctrine of overbreadth to invalidate them. *See Hoffman Estates*, 455 U.S. at 496–97, 102 S.Ct. 1186. Therefore, Dr. Hyman's objections to the ordinances' advertising prohibitions must fail.

## B. The Incitement Prohibition

■ Dr. Hyman also objects to portions of the ordinances which prohibit "any person" from acting to "incite" another to violate any portion of the ordinances' bans on discrimination. Lou.Code Ord. § 98.17(F)(2); Jeff.Co.Code Ord. § 92.16(B). He correctly asserts that the First Amendment prohibits a government unit from forbidding advocacy of law violation except when such advocacy is directed to inciting imminent lawless conduct and is likely to produce such conduct. *See Brandenburg v. Ohio*, 395 U.S. 444, 447–48, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). He argues that the ordinances are not written to apply only and specifically to such advocacy and, therefore, must be found unconstitutional.

Under the "case" or "controversy" requirement of Article III of the Constitution, federal courts are presumed to lack jurisdiction to hear a complaint "unless the contrary appears firmly in the record." *Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 546, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986) (citations omitted). The initial question which we must answer in all cases is whether the parties have presented " 'a real substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract.' " *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) (quoting *Railway Mail Ass'n v. Corsi,* 326 U.S. 88, 93, 65 S.Ct. 1483, 89 L.Ed. 2072 (1945)).

Dr. Hyman has not proposed to engage in any conduct which would run afoul of even a broad interpretation of the incitement provisions of the ordinances. Thus, there is no real, concrete dispute between the parties over this issue, and we are asked, essentially, to render an advisory opinion. We have no jurisdiction to consider such a nonjusticiable question and must dismiss this claim, not on the merits, but upon Dr. Hyman's failure to meet the requirements of Art. III.

## IV. Freedom of Association

■ Dr. Hyman claims that his freedom of association, as guaranteed by the First Amendment, is violated by the ordinances. *See* Am.Compl. at ¶¶ 41–45. The Intervenor–Defendants have moved for summary judgment on this claim, arguing that pursuant to *Roberts v. United States Jaycees,* 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), Dr. Hyman's medical practice is not entitled to this sort of First Amendment protection.[17] For the reasons set forth below, we agree.

In *Roberts,* the Supreme Court held that two types of relationships are entitled to protection under the Freedom of Association Clause of the First Amendment. First, the Court held that "certain intimate human relationships" such as those that "attend the creation and sustenance of a family" are to be afforded constitutional protection. *Roberts,* 468 U.S. at 618–19, 104 S.Ct. 3244. The second type of constitutionally protected relationship is one's "right to associate for the purpose of engaging in those activities protected by the First Amendment-speech, assembly, petition for the redress of grievances, and the exercise of religion." *Id.* at 618, 104 S.Ct. 3244. This "freedom of expressive association" is protected in order to preserve "political and cultural diversity" and to shield "dissident expression from suppression by the majority." *Roberts,* 468 U.S. at 618, 622, 104 S.Ct. 3244.

The ordinances in question do not violate Dr. Hyman's "freedom of intimate association." Dr. Hyman's ability to enter into the sort of "highly personal relationships" contemplated by the *Roberts* Court is in no way impaired by either ordinance. *See Roberts,* 468 U.S. at 618, 104 S.Ct. 3244. The record indicates that Dr. Hyman's medical practice is simply a commercial enterprise. *See, e.g.,* Hyman Affidavit; Hyman Dep. at 21, –22, Ex. 3. The Supreme Court has interpreted the First Amendment to provide little protection under the Freedom of Association Clause to commercial enterprises. *See Roberts, supra,* at 620, 104 S.Ct. 3244 (noting that "the Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse that would not apply to regulations affecting the choice of one's fellow employees"). *See also Watson v. Fraternal Order of Eagles,* 915 F.2d 235, 244 (6th Cir.1990). Dr. Hyman does not allege that the ordinances abridge any relationship other than that

---

**17.** The basis for Dr. Hyman's freedom of association claim is difficult to determine because he never addresses the claim in any of his briefs filed in connection with these motions. Therefore, we will consider any claim that could be made by Dr. Hyman that would be consistent with the Freedom of Association Clause of the First Amendment.

which exists between himself, as employer, and his employees. As the Court in *Roberts* indicated, free association protections are not extended to such relationships. Therefore, even when drawing all reasonable inferences against the defendants, there has been no showing that Dr. Hyman's "freedom of intimate association" is, in any way, impaired by the ordinances.

The record also would not support a finding that Dr. Hyman's "freedom of expressive association" is implicated by the ordinances. Such a finding depends largely upon that group's purpose or mission. *See, e.g., Roberts v. United States Jaycees*, 468 U.S. at 626–28, 104 S.Ct. 3244; *Boy Scouts of America v. Dale*, 530 U.S. 640, 120 S.Ct. 2446, 2451–52, 147 L.Ed.2d 554 (2000); *Hishon v. King & Spalding*, 467 U.S. 69, 78, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Watson*, 915 F.2d at 244. Dr. Hyman has made no allegation that would suggest that his practice has as a purpose the exercise of his 'religion. As the Court held in *Hishon, supra*, where it was faced with a law firm's assertion of a freedom of association defense in response to a claim of discriminatory discharge, " '[i]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections.' " *Hishon*, 467 U.S. at 78, 104 S.Ct. 2229 (quoting *Norwood v. Harrison*, 413 U.S. 455, 470, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973)). Therefore, we find that Dr. Hyman's "freedom of expressive association" is not implicated by the ordinances.

## V. Equal Protection

■ The Equal Protection Clause of the Fourteenth Amendment essentially states that "all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)). A statute which draws a distinction between those to whom it applies will normally be upheld if that distinction is rationally related to a legitimate government interest. *See id.* at 440, 105 S.Ct. 3249. However, as Dr. Hyman correctly points out, if a statute "impinge[s] on personal rights protected by the Constitution," then strict scrutiny review is applied, and the statute will be upheld only if it is narrowly tailored to serve a compelling government interest. *See id.*

As we have noted above, neither the City nor the County Ordinance impinges on Dr. Hyman's First Amendment rights. Therefore, the proper inquiry is whether or not the exemptions in the ordinances are rationally related to a legitimate state interest. *See Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 339, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987) (holding that "where a statute is neutral on its face and motivated by a permissible purpose of limiting governmental interference with the exercise of religion," the proper level of scrutiny is rational basis review).[18]

We find the Supreme Court's decision in *Amos, supra*, to be instructive on this point. In *Amos*, the Court was faced with a challenge to Title religious exemption

---

**18.** The *Amos* Court noted that because the exemption at issue did not discriminate between religions, strict scrutiny review was unnecessary. Rather, the Court held that such a neutral statute need only pass muster under the less demanding test set forth in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), in order to satisfy the requirements of the Establishment Clause. Because Dr. Hyman does not claim that the religious exemptions he challenges violate the Establishment Clause of the First Amendment, we need not address whether the ordinances satisfy the *Lemon* test. Instead, our conclusion that the ordinances do not violate the Free Exercise Clause is sufficient to justify our determination that rational basis review, rather than strict scrutiny, applies here. *See Amos, supra*, at 338–39, 107 S.Ct. 2862.

which permitted religious employers to discriminate on the basis of religion. While the challenge in *Amos* was based on the Establishment Clause, the Court addressed the issue of equal protection, as well. The Court held that Title VII's religious exemption was "rationally related to the legitimate purpose of alleviating significant governmental interference with the ability of religious organizations to define and carry out their religious missions." *Amos*, 483 U.S. at 339, 107 S.Ct. 2862. Because we believe that the facts which confronted the Supreme Court in *Amos* are analogous to those with which we are now faced, and because we conclude that the exemptions included in the ordinances challenged by Dr. Hyman are intended to alleviate similar interference with religious institutions, we find that the exemptions contained in both the City and the County Ordinances are rationally related to the same purpose of alleviating governmental interference with the activities of religious institutions. Therefore, Dr. Hyman's challenge, to the extent it is based on the Equal Protection Clause of the Fourteenth Amendment, must fail.[19]

## VI. Due Process

■ Dr. Hyman next claims that the terms "sexual orientation" and "gender identity," as used in the ordinances, are unconstitutionally vague in violation of the Due Process Clauses of the Fifth and Fourteenth Amendments. As such, Dr. Hyman urges this court to invalidate the ordinances to the extent they prohibit discrimination because of "sexual orientation" and "gender identity."

A statute may be found to be void for vagueness for one of two reasons. First, a statute that "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" may be found to be unconstitution-

ally vague. *Hill v. Colorado*, 530 U.S. 703, 120 S.Ct. 2480, 2498, 147 L.Ed.2d 597 (2000). Second, a statute will be struck down under the void-for-vagueness doctrine "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Id.* However, "where the common meaning of the word provides both adequate notice of the conduct prohibited and of the standards for enforcement," a statute containing the allegedly vague words will be upheld against a Due Process Clause challenge. *Belle Maer Harbor v. Charter Tp. of Harrison*, 170 F.3d 553, 558 (6th Cir.1999).

The term "sexual orientation" is defined by both the City and the County Ordinances as "[a]n individual's actual or imputed heterosexuality, homosexuality or bisexuality." Lou.Code Ord. § 98.16; Jeff. Co.Code Ord. § 92.02. "Gender identity" is also defined by the ordinances. The City Ordinance defines "gender identity" as either "(A) Having a gender identity as a result of a sex change surgery; or (B) Manifesting, for reasons other than dress, an identity not traditionally associated with one's biological maleness or femaleness." Lou.Code Ord. § 98.16. The term is defined by the County Ordinance as "[m]anifesting an identity not traditionally associated with one's biological maleness or femaleness." Jeff.Co.Code Ord. § 92.02. Neither ordinance defines any of the terms referred to in the relevant definitions. However, the failure of both the City and the County to define these terms is not fatal to the ordinances. Rather, as noted above, we must look to the "common meaning" of the terms used by the ordinances. *See Belle Maer Harbor, supra,* at 558. As discussed below, we believe such a common meaning exists and that a person of ordinary intelligence would understand to whom the terms apply.

19. "The standards for equal protection analysis under the Kentucky Constitution are the same as those under the Fourteenth Amendment of the United States Constitution." *Commonwealth v. Meyers,* 8 S.W.3d 58, 61 n.

4 (Ky.Ct.App.1999) (citations omitted). Therefore, Dr. Hyman's challenge based on the Kentucky Constitution's equivalent of the Equal Protection Clause must also fail.

Several courts have been faced with, and discussed, "sexual orientation" as it is used in various statutes and regulations. *See, e.g., State v. Palermo*, 765 So.2d 1139, 1152–53 (La.Ct.App.2000); *State v. Mortimer*, 135 N.J. 517, 641 A.2d 257, 265–66 (1994). None have found either the term, or a phrase which uses the term, vague in the face of a Due Process Clause challenge. While "gender identity" is less commonly addressed by courts, those that have attempted to define the term have done so consistently. *Compare Smith v. Palmer*, 24 F.Supp.2d 955, 959 n. 3 (N.D.Iowa 1998) *with Farmer v. Brennan*, 511 U.S. 825, 829, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), *and Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir.1999).

Second, the use of the terms "sexual orientation" and "gender identity" in many statutes, ordinances, and regulations is consistent with their use in the ordinances challenged by Dr. Hyman. *See, e.g.,* Minn. Stat.Ann. § 363.01(45) (West 2000); Atl. Code Ord. § 94–10 (Atlanta, Ga.); Iowa City Ord. § 2–1–1 (Iowa City, Iowa); Lex.–Fayette Co.Code Ord. § 2–33(4), (5) (Lexington, Ky.); Mad.Code Ord. § 3.23(2)(t), (hh) (Madison, Wis.); San Francisco Police Code § 3303 (San Francisco, Cal.); Seattle Mun.Code § 14.04.030 (Seattle, Wash.); Tucson Code Ord. § 17–11(h), (r) (Tucson, Az.). While these similarities are by no means conclusive, they are nonetheless relevant to our understanding of the terms' common meanings.

Finally, an abbreviated survey of contemporary reference materials indicates that the ordinances' definitions are consistent with the terms' common meanings. *See* Black's Law Dictionary 1379 (7th ed.1999) (defining "sexual orientation" as "[a] person's predisposition or inclination toward a particular type of sexual activity or behavior; heterosexuality, homosexuality, or bisexuality"); The New Encyclopaedia Brittanica, 5 Micropaedia 172 (15th ed.1994) (defining "gender identity" as "an individual's self-conception as being male or female, as distinguished from actual

biological sex"). These sources, because of their relevance both in and out of the courtroom, are even stronger indications that the definitions assigned to the challenged terms are consistent with their common meanings.

In the face of these consistent interpretations of "sexual orientation" and "gender identity" by diverse sources, Dr. Hyman argues that both the terms and their definitions are inadequate. *See* Hyman MSJ at 41–45. With regard to "gender identity," Dr. Hyman poses several hypothetical questions to accentuate the term's ambiguity:

> What is meant by "manifesting," "identity," "traditionally associated," and "biological maleness or femaleness," is simply impossible to tell from the face of either Ordinance. Does manifesting mean pretending? Does identity mean an identity at any time, à permanent identity, or a temporary identity? Whose concept or understanding of "tradition" applies? The employee, the employer, the Human Relations Commission, or the courts? Finally, what authority or standard is to measure what is traditionally associated with "biological maleness or femaleness"?

Hyman MSJ at 44.

Dr. Hyman's reasoning is "hypertechnical." *See Hill v. Colorado*, 120 S.Ct. at 2498. In *Hill*, the Supreme Court addressed a void-for-vagueness challenge to the use of the word "approaching" in a statute. The Court stated that "while '[t]here is little doubt that imagination can conjure up hypothetical cases in which the meaning of these terms will be in nice question,' because we are '[c]ondemned to the use of words, we can never expect mathematical certainty from our language[.]'" *Id.* (citing *American Communications Ass'n v. Douds*, 339 U.S. 382, 412, 70 S.Ct. 674, 94 L.Ed. 925 (1950); *Grayned v. City of Rockford*, 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). We believe the level of certainty that Dr. Hyman seeks is unattainable in this in-

stance. The definitions of "sexual orienta-
tion" and "gender identity" are consistent
with the meanings attributed to those
terms by common usage. Therefore, we
find that neither those terms nor their
definitions are unconstitutionally vague.

## VII. KRS § 82.082

In addition to his constitutional
arguments, Dr. Hyman claims that the
ordinances, as amended in 1999, violate
KRS § 82.082.[20] Specifically, Dr. Hyman
alleges that Kentucky, through its enact-
ment of the Kentucky Civil Rights Act,
KRS §§ 344.010–.990 ("the KCRA"), has in
place "a comprehensive scheme of legisla-
tion" on the subject of discrimination. By
expanding the coverage of the Kentucky
statute, Dr. Hyman contends that the ordi-
nances violate KRS § 82.082(2).[21] *See* Hy-
man MSJ at 46.

The KCRA prohibits discrimination on
the basis of various characteristics in the
context of employment, *see* KRS
§ 344.040, access to public accommoda-
tions, *see* KRS § 344.120, housing, *see*
KRS § 344.360, and education, *see* KRS
§ 344.555. However, our reading of the
KCRA indicates that the bases on which
discrimination is prohibited listed in the
various provisions are nonexclusive and
that the Kentucky General Assembly has
left room for local governments to prohibit
discrimination in various contexts based on
characteristics not listed in any provision
of the KCRA. The language of the KCRA
itself informs our conclusion.

Several aspects of the text of the KCRA
indicate an intent on the part of the Gen-

eral Assembly to allow local governments
to combat discrimination. First, the pro-
vision which makes explicit the policy of
the KCRA states that "[n]othing in this
chapter shall be construed as indicating
an intent to exclude local laws on the
same subject matter not inconsistent with
this chapter." KRS § 344.020(3). As-
suming, as Dr. Hyman argues, that the
ordinances are inconsistent with the
KCRA, this provision, standing alone, bol-
sters his contention that the ordinances
are invalid. However, when read in con-
junction with a second provision of the
KCRA, it becomes evident that the gener-
al subject matter of the KCRA and the
ordinances are consistent. KRS § 344.300
states in relevant part:

> (1) Cities and counties are authorized to
> adopt and enforce ordinances, orders,
> and resolutions prohibiting all forms of
> discrimination, including discrimination
> on the basis of race, color, religion, dis-
> ability, familial status, or national origin,
> sex, or age, and to prescribe penalties
> for violations thereof, such penalties be-
> ing in addition to the remedial orders
> and enforcement herein authorized.

This provision explicitly permits local gov-
ernments to prohibit "all forms of dis-
crimination." *Id.* That the forms of dis-
crimination prohibited do not constitute
an exhaustive list is also made clear by
the use of the word "including." *Id. See
also Cornelison v. Commonwealth,* 990
S.W.2d 609, 610 (Ky.1999) (finding that
the use of the word "including" in a stat-
ute indicates that the list is illustrative

**20.** KRS § 82.082 states in relevant part:
   (1) A city may exercise any power and per-
   form any function within its boundaries . . .
   that is in furtherance of a public purpose of
   the city and not in conflict with a constitu-
   tional provision or statute.
   (2) A power or function is in conflict with a
   statute if it is expressly prohibited by a
   statute or there is a comprehensive scheme
   of legislation on the same general subject
   embodied in the Kentucky Revised Statutes
   including, but not limited to, the provisions
   of KRS Chapters 95 and 96.

**21.** Because KRS § 82.082 applies only to
   "cities," the County Ordinance is not explicit-
   ly covered by the statute. However, KRS
   § 67.083, which enumerates additional pow-
   ers given to county governments, contains
   provisions analogous to those in KRS
   § 82.082. *See* KRS § 67.083(6). Therefore,
   while we discuss the KCRA with respect only
   to the City of Louisville and KRS § 82.082,
   we note that our conclusion is the same with
   respect to Jefferson County and KRS
   § 67.083.

and not exhaustive). By employing these phrases in this provision, the legislature has clearly indicated an intent to allow local governments to expand the scope of their antidiscrimination statutes. The plain meaning of the KCRA's text makes clear that when the General Assembly enacted the KCRA, it did not intend to preclude municipalities such as Jefferson County and the City of Louisville from expanding the scope of antidiscrimination statutes to protect those individuals not covered by the KCRA itself. As a result, we find that the City Ordinance is consistent with KRS § 82.082 and that the County Ordinance is consistent with KRS § 67.083.

## VIII. Kentucky Constitution § 59

§ 59 of the Kentucky Constitution states that "[t]he General Assembly shall not pass local or special acts" concerning a variety of subjects ranging from the granting of divorces to the protection of game and fish. The purpose of this prohibition "is to require that all laws upon a subject shall operate alike upon all individuals and corporations." *Jefferson County Police Merit Bd. v. Bilyeu*, 634 S.W.2d 414, 416 (Ky.1982) (citations omitted). *See also Department of Finance v. Dishman*, 298 Ky. 545, 183 S.W.2d 540, 543 (1944) (noting that the purpose of § 59 is to "bar favoritism and discrimination, and to insure equality under law").

§ 59 expressly applies only to laws passed by the General Assembly. Further, we find no Kentucky authority that expands the scope of § 59 to include ordinances enacted by city or county governments. The only argument that could be made in support of Dr. Hyman's claim is that by authorizing local governments to supplement the state Civil Rights Act, the General Assembly has somehow violated § 59. However, since Dr. Hyman has failed to make this argument, we will refrain from addressing it. It is sufficient for us to conclude that our reading of § 59 and Kentucky decisions which interpret it indicates that only the General Assembly

is prohibited from enacting so-called "special legislation." Therefore, we will grant the City Defendants' motion for summary judgment with respect to ¶¶ 73–76 of Dr. Hyman's First Amended Complaint.

## IX. *Ultra Vires*

### A. Kentucky Constitution §§ 27, 28

Dr. Hyman contends that the City Ordinance violates §§ 27 and 28 of the Kentucky Constitution which provide for the division of powers "of the government of the Commonwealth of Kentucky" among a legislative, an executive, and a judicial department. Ky. Const. §§ 27, 28. However, both the texts of these provisions and Kentucky decisions which interpret them make clear that they do not apply to municipal governments. *See Dieruf v. Louisville & Jefferson County Bd. of Health*, 304 Ky. 207, 200 S.W.2d 300, 302 (1947); *Bryan v. Voss*, 143 Ky. 422, 136 S.W. 884, 887 (1911). Therefore, the actions of Louisville's Board of Alderman may not be challenged pursuant to Ky. Const. §§ 27, 28.

### B. KRS § 83.430

Dr. Hyman finally challenges the City Ordinance on the basis that it violates KRS § 83.430 which states that "[i]n each city of the first class there shall be a legislative, an executive, and a judicial department. None of these departments shall exercise any power properly belonging to either of the others, except as permitted by law." The City Defendants do not claim that the City of Louisville is not a city of the first class. Rather, they argue that the actions of the Board of Aldermen did not violate KRS § 83.430 because its conduct was permitted by law.

Dr. Hyman claims that because one of the aldermen who voted in favor of amending the City Ordinance was serving as Mayor, *pro tempore*, at the time, KRS § 83.430 was violated. *See* Am.Compl. at ¶ 84. However, KRS § 83.560 states that "[d]uring the temporary absence or disability of the mayor his office shall be

administered and its duties discharged by the president of the board of aldermen." The City Defendants maintain that on the day in question, the President of the Board of Alderman was serving as Mayor, *pro tempore*, pursuant to KRS § 83.560. *See* City MSJ at 52. Dr. Hyman has failed to rebut these allegations with evidence of his own. Indeed, Dr. Hyman does not address the *ultra vires* issue in any of the extensive briefs filed with regard to these motions. Therefore, even drawing inferences in Dr. Hyman's favor, we find that summary judgment in favor of the City Defendants with respect to ¶¶ 83–85 of Dr. Hyman's Amended Complaint is proper.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for summary judgment will be denied. The defendants' motions for summary judgment will be denied with respect to the issues of standing and ripeness. The defendants' motions will be granted in all other respects. A separate order will be entered this date in accordance with this opinion.